## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 15-cv-0109-WJM-STV

MICHAEL VALDEZ,

      Plaintiff,

v.

ROBERT MOTYKA, Jr., Denver Police Officer, in his individual capacity;
CITY AND COUNTY OF DENVER, a municipality,

      Defendants.

---

## ORDER CERTIFYING INTERLOCUTORY APPEAL AS FRIVOLOUS

---

Plaintiff Michael Valdez ("Valdez") was shot in the back by Denver police officer Robert Motyka, Jr. ("Motyka"), at the end of a car chase in which occupants of the car Motyka was pursuing fired at Motyka and struck him in the shoulder. Valdez claims that Motyka's gunshot constituted excessive force in violation of the Fourth Amendment. Valdez further claims that the City and County of Denver ("Denver") is liable for failure to train, supervise, and discipline its officers.

This lawsuit was presided over by Senior U.S. District Judge Richard P. Matsch until his passing in May 2019. A month before that, Judge Matsch ruled that another police officer involved in the incident, John Macdonald, was entitled to summary judgment, but there were material disputes of fact preventing summary judgment as to Motyka (including disputes regarding the facts that would demonstrate his entitlement to qualified immunity) and as to Denver. (ECF No. 124.) Defendants appealed Judge Matsch's denial of qualified immunity as to Motyka. (ECF No. 128.)

Defendants' appeal divested this Court of jurisdiction over the merits of this case. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). However, the Tenth Circuit has established a procedure (discussed in more detail below) by which this Court may certify the appeal as frivolous and thereby regain jurisdiction. Currently before the Court is Valdez's Motion to Certify Defendants' Interlocutory Appeal as Frivolous (ECF No. 137), invoking this procedure.

For the reasons explained below, Valdez's motion is granted and the Court will move forward with trial preparations.

## I. QUALIFIED IMMUNITY STANDARD

Understanding the background and arguments below requires understanding the qualified immunity defense. The Court will therefore explain that defense at the outset.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once the defendant raises a qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the law was clearly established at the relevant time. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014); *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). "A right is

clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas*, 765 F.3d at 1194 (internal quotation marks omitted). Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

## II. BACKGROUND

The Court draws the following facts from the summary judgment record, which clearly shows where the parties agree and disagree regarding the relevant facts. (*See* ECF Nos. 82, 92, 104.)

On January 16, 2013, Denver police received reports of a domestic violence incident and two shooting incidents, all involving a red Dodge pickup truck. The truck was spotted later in the day and a police chase ensued through the streets of north Denver. Valdez was a passenger in the truck.

One of the police pursuers, Motyka, was fired on from the truck. He says he saw two people from the truck firing at him, one of whom he is certain was Valdez. One of the bullets struck Motyka in the left shoulder, causing him to pull over and assess his injury momentarily, but he eventually joined other officers who had continued the chase.

The chase ended at Columbus Park when the truck collided with a tree on the

edge of the park. The chasing officers, including Motyka, took up positions behind their cruisers, or the doors of their cruisers, some fifty to sixty feet behind the truck, with guns drawn.

Occupants of the truck began exiting. One of them fled into the park. Valdez says that he and a female occupant both exited the passenger side of the truck (the driver's side was smashed) and laid on the grass there in a prone position, with Valdez placing his hands on or above his head. Valdez says that, in this position, Motyka and another officer, Macdonald, opened fire on him, with Motyka in particular motivated by revenge. Motyka says that Valdez did not lay on the ground, but got out of the truck and then began reaching back into the truck, which Motyka perceived as an action to retrieve the gun with which Valdez had been shooting at him. Motyka therefore opened fire, and Macdonald, who arrived seconds later, opened fire because Motyka opened fire.

One bullet, later established through ballistic evidence to have been fired by Motyka, struck Valdez in the lumbar region, shattering a portion of his spine and temporarily paralyzing him. Another bullet tore off most of his left ring finger. No evidence could confirm who fired that bullet.

Sometime during all of this, the truck's driver, Johnny Montoya, exited out the passenger side and refused to obey police commands, which eventually prompted two other officers to shoot and kill him. According to the police after-action report, there was a gap of about three minutes between the time Motyka fired on Valdez and the time that other officers fired on Montoya. During those three minutes, Motyka had withdrawn due to his shoulder wound, so he was not part of the gunfire that killed Montoya.

Valdez filed this lawsuit on January 15, 2015. (ECF No. 1.) Defendants moved for summary judgment on May 31, 2018. (ECF No. 82.) As relevant here, Defendants argued that Valdez's deposition testimony established that they never seized him within the meaning of the Fourth Amendment. Specifically, Valdez had testified that, *before* he was shot, Johnny Montoya exited the truck and began behaving erratically. Soon after, Valdez noticed bullets begin to strike the ground around him, and then felt the bullets that struck his finger and back. (*See id.* at 19–21.) Defendants therefore argued that Valdez's version of the facts showed he was accidentally hit in a hail of gunfire directed at Johnny Montoya, and such accidental bullet strikes are not a seizure within the meaning of the Fourth Amendment. (*Id.* at 21–24.)

Defendants knew that this story conflicted with their own memories and police records. (*See id.* at 15 ("The officers have a very different version of events than that portrayed by Plaintiff.").) In particular, Motyka had testified that he intentionally shot *at Valdez* (who was not lying on the ground at the time) because he thought Valdez was reaching back into the truck cab for a gun. (*See* ECF No. 92-1 at 10.) Motyka also testified that he had withdrawn well before the gunfire that killed Montoya. (*See id.*) But Defendants insisted that, because they had invoked qualified immunity, Valdez was required to prove that his version of the story showed a violation of clearly established rights. (ECF No. 82 at 15–16.)

Valdez responded that, for purposes of determining a genuine dispute of material fact, the Court could look at all of the evidence—there is no requirement limiting the nonmoving party to relying on his, her, or its version of the facts as presented in a deposition. (ECF No. 92 at 38–43.) And, in that light, there was significant evidence

(the police officers' deposition testimony, the location of the bullet strikes in Valdez's body and the area surrounding him, etc.) to establish that Motyka and Macdonald intentionally fired upon him while he was lying on the ground. (*Id.* at 44–48.)

Valdez also submitted a declaration stating that, during his deposition, he "mixed up the timing of when certain things happened," and that all of the relevant interactions between Johnny Montoya and the police occurred after he (Valdez) had been struck with two bullets. (ECF No. 92-27.)

In reply, Defendants again insisted that, in the qualified immunity context, the typical summary judgment requirement of viewing the facts in the light most favorable to the plaintiff, wherever they may be found in the record, does not apply. Defendants leaned heavily on concurring opinions from Tenth Circuit decisions, and extra-circuit authority. (ECF No. 104 at 3–7.)

Defendants also moved to strike Valdez's supplemental declaration as a "sham affidavit." (ECF No. 102.) Judge Matsch denied that motion. (ECF No. 111.)

In his summary judgment order, Judge Matsch acknowledged "[t]here are many factual disputes about the sequence of events and the conduct of the officers and occupants of the truck. There are also inconsistent statements and testimony from those present . . . ." (ECF No. 124 at 2.) With this in mind, Judge Matsch then provided a "narrative [that] is a version of events that a reasonable jury could find drawing all inferences in favor of Valdez." (*Id.* at 3.) As relevant here, that version of events included the following:

- "Motyka started shooting immediately on arrival at his position. He fired a burst of six or seven rounds. After a brief pause he fired another burst.

Lt. Macdonald arrived in moments and started firing in the same direction as Motyka.  He shot six times."  (*Id.*)

- "It is apparent that the area was sprayed with bullets permitting the inference that the officers were firing without aiming at a clear target."  (*Id.*)

- "The defendants argue that there was no seizure of Valdez under the Fourth Amendment by Motyka and Macdonald prior to the shooting.  That is irrelevant.  There can be no doubt that all of the occupants of the truck were seized by DPD officers when the truck crashed.  They were surrounded by police cars and officers.  Valdez was shot and thereby immobilized.  It may be true that they did not intentionally shoot at Valdez while he was on the ground in a surrendering position but that is not required for liability because the record indicates that there was a hail of gunfire by them which can support a finding of reckless and unreasonable conduct."  (*Id.* at 5.)

- "[N]o one was actively shooting at the police when [Motyka] and Macdonald arrived.  Motyka had protective cover from [a third officer's] vehicle.  One occupant had already run away.  A jury could reasonably find that . . . a reasonable officer in Motyka's position would have waited for the situation to develop further before shooting at an identifiable threat which Johnny Montoya presented a few minutes later."  (*Id.* at 5–6.)

- "It is recognized that the use of deadly force must be judged from the percepti[on] of a reasonable officer on the scene forced to make split second judgments about the amount of force necessary in a particular

situation.  But reasonableness depends upon whether the officers were in danger at the precise moment that they used force.  [¶]  Here there was a lull in the action which the defendant officers should have recognized . . . ." (*Id.* at 6 (citation omitted).)

- "There is a question of fact as to the position of Valdez when Motyka began firing and when Motyka's bullet struck Valdez in the back.  It is a reasonable inference that the bullet came from the second round of shots at which time Valdez was on the ground, given the location of the bullets found near the place where he was lying.  Even if Valdez had been standing there was no basis to believe that he was a threat in that he was not armed." (*Id.*)

- "The law requires an imminent threat [before use of deadly force is justified] and there was none unless the testimony of the defendants is believed that they saw Valdez with a gun.  That testimony has been sufficiently challenged in this record to discount it at this summary judgment stage, leaving it for the jury at trial." (*Id.* at 7.)

Because the restrictions on deadly force are clearly established, and because the jury could believe a set of facts in which no reasonable officer could find to justify deadly force, Motyka was not entitled to qualified immunity.  (*Id.*)[1]

### III.  ANALYSIS

Normally an order denying summary judgment is not appealable, but in *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Supreme Court created an exception where the

---

[1] For reasons not relevant here, Judge Matsch found that Macdonald's circumstances were different and granted him qualified immunity.  (*Id.* at 7–8.)

order in question denies qualified immunity and the question on appeal will be whether the official deserved qualified immunity under a given set of facts: either "the facts . . . as asserted by the defendant," which show that the defendant "violated clearly established law," or "the facts . . . as asserted by the plaintiff," which, if accepted by a jury, would show "the defendant is not immune." *Id.* at 527. But in *Johnson v. Jones*, 515 U.S. 304 (1995), the Supreme Court held that the *Mitchell* exception does not apply when the "district court's summary judgment order . . . , though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Id.* at 313. In other words, if the district court denies qualified immunity due to a genuine dispute regarding the facts around which qualified immunity turns (*e.g.*, whether the officer fired his weapon before or after a significant event, reason to believe that the officer is lying about what she perceived at the time of the incident, etc.), the defendant may not immediately appeal and argue that the district court wrongly found the evidence in the plaintiff's favor to be sufficient. *See id.*

Part of *Johnson*'s reasoning was the need to avoid delaying the adjudication on the merits where the question on appeal would essentially be a question of how one might view the evidence. *Id.* at 316–17. Even before *Johnson*, however, the Tenth Circuit saw the possibility of public officials abusing *Mitchell* to file appeals of qualified immunity denials, simply to slow down the lawsuit—because an appeal, even if it should not have been filed, normally prevents the district court from continuing to adjudicate the case. *See Stewart v. Donges*, 915 F.2d 572, 574 (10th Cir. 1990). In *Stewart*, the Tenth Circuit held that an appeal of the denial of qualified immunity would *not* prevent

the district court from continuing to adjudicate the case "if the district court (1) after a hearing and, (2) for substantial reasons given, (3) f[inds] the [defendant's] claim [that the *Mitchell* exception applies] to be frivolous." *Id.* at 576. In other words, "Once a notice of appeal on an appealable issue such as qualified immunity is filed, the status quo is that the district court has lost jurisdiction to proceed. To regain jurisdiction, it must take the affirmative step of certifying the appeal as frivolous or forfeited . . . ." *Id.* at 577.

To determine whether an appeal is frivolous, this Court must essentially perform the qualified immunity analysis that the Tenth Circuit would be required to perform. That, in turn, requires the Court to look at the set of facts the Tenth Circuit must accept as true for purposes of judging the defendant's actions. And this is where the parties' current dispute focuses.

Defendants do *not* continue to argue, as they did to Judge Matsch, that their invocation of qualified immunity requires the district court to take the facts precisely as the plaintiff alleges them to be, regardless of evidence generated by other parties that might support the plaintiff's claim. Perhaps Defendants have abandoned this argument because Judge Matsch denied their motion to strike Valdez's supplemental declaration, so Valdez's story is no longer consistent with Defendants' (knowingly counterfactual) story that Valdez must have been injured accidentally while officers were firing on Johnny Montoya.

Defendants instead argue that the Tenth Circuit must judge qualified immunity according to the facts as Judge Matsch described them (as opposed to in a light most favorable to the plaintiff, regardless of how Judge Matsch described them), and that description raises legal questions. (ECF No. 145 at 4–6, 11–12.) Specifically,

Defendants first argue that there is a legal question regarding what constitutes a Fourth

Amendment seizure:

> Regarding the question of whether Valdez was seized,
> [Judge Matsch] concluded that "there can be no doubt that
> all of the occupants of the truck were seized by DPD Officers
> when the truck crashed." (Order [Doc. #124] p. 5.) The
> facts found by the Court on this point were that, at the time
> the truck crashed, [a third police officer, not a party here]
> was the lead car in pursuit and the first to arrive at the scene
> and that Sgt. Motyka arrived "within moments." (*Id.* at 2.)
> Thus, the legal question presented on appeal is whether Sgt.
> Motyka's arrival at the scene of the crash is sufficient to
> establish that he seized Valdez within the meaning of the
> Fourth Amendment.

(ECF No. 145 at 6.)

This argument is easily resolved without ever having to delve into the possible

difference between reviewing qualified immunity according to the district court's

recitation of the facts or according to the view of the facts most favorable to the plaintiff.

Defendants fail to quote the full relevant language from Judge Matsch's order: "There

can be no doubt that all of the occupants of the truck were seized by DPD officers when

the truck crashed. They were surrounded by police cars and officers. *Valdez was shot

and thereby immobilized.*" (ECF No. 124 at 5 (emphasis added).)

"[T]here can be no question that apprehension by the use of deadly force is a

seizure subject to the reasonableness requirement of the Fourth Amendment."

*Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Thus, whatever Judge Matsch may have

thought about the circumstance of being surrounded by police cruisers and police

officers with their weapons drawn, it has nothing to do with the question of the "seizure"

alleged in this case, *i.e.*, Motyka shooting Valdez. The Court can find nothing in the

record demonstrating that Valdez has argued that the constitutional injury began with

being surrounded, as opposed to being struck by a bullet, and it is difficult to see how

Defendants can maintain that the constitutional significance of being surrounded by

police with guns drawn is a relevant legal issue for the Tenth Circuit to decide.

Defendants have a second argument, however, that poses more problems.

"Similarly," they say,

> [Judge Matsch] found that "[i]t may be true that [Sgt. Motyka]
> did not intentionally shoot at Valdez while he was on the
> ground in a surrendering position but that is not required for
> liability …." (Order [Doc. #124] p. 5.) The question of
> whether Sgt. Motyka could be deemed to have seized
> Valdez in violation of the Fourth Amendment despite the fact
> that he did not intentionally fire at him as he lay on the
> ground is also a legal issue reviewable by this Court [*sic*].

(ECF No. 145 at 7.) Later in their brief, Defendants add that "[Judge Matsch] found that

'the officers were firing without aiming at a clear target.'" (ECF No. 145 at 11 (quoting

ECF No. 124 at 3).) The full relevant quotation is, "It is apparent that the area was

sprayed with bullets permitting the inference that the officers were firing without aiming

at a clear target."

Regardless, this argument has legs only because the Tenth Circuit has employed

two subtly different descriptions of the set of facts it assumes as true for purposes of

resolving an interlocutory qualified immunity appeal. On the one hand, the Tenth Circuit

has stated,

> Appellate jurisdiction in cases of this type is clear when the
> defendant does not dispute the facts alleged by the plaintiff.
> Alternatively, as here, if the defendant does dispute the
> plaintiff's allegations the defendant must nonetheless be
> willing to concede the most favorable view of the facts to the
> plaintiff for purposes of the appeal.

*Farmer v. Perrill*, 288 F.3d 1254, 1258 (10th Cir. 2002) (internal quotation marks

omitted); *see also Henderson v. Glanz*, 813 F.3d 938, 948 (10th Cir. 2015) (quoting

*Farmer* for this proposition); *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (same); *Eidson v. Owens*, 515 F.3d 1139, 1145 (10th Cir. 2008) (same).  This standard focuses on the story the plaintiff intends to present.  On the other hand, the Tenth Circuit has also stated that the Supreme Court's *Johnson v. Jones* decision "requires [the appellate court] to accept as true the facts the district court expressly held a reasonable jury could accept." *Walton v. Powell*, 821 F.3d 1204, 1208 (10th Cir. 2016).  This standard focuses specifically on the district court's assessment of the facts as presented at summary judgment.  *See also Estate of Ceballos v. Husk*, 919 F.3d 1204, 1209 (10th Cir. 2019) (quoting the *Walton* standard, but also going on to say "we view the facts in the light most favorable to the non-moving parties and resolve all factual disputes and reasonable inferences in their favor" (internal quotation marks omitted; alterations incorporated)); *Blossom v. Yarbrough*, 429 F.3d 963, 966 (10th Cir. 2005) ("the court of appeals usually takes the facts as assumed by the district court in conducting its review of pertinent legal questions").

These standards are not obviously talking about different things.  In most cases, no daylight will be visible between them.  District courts usually deny summary judgment by finding that the plaintiff has enough evidence to prove his or her story.  In other words, "the most favorable view of the facts to the plaintiff," *Farmer*, 288 F.3d at 1258, and "the facts the district court expressly held a reasonable jury could accept," *Walton*, 821 F.3d at 1208, are the same thing in most cases.  But Judge Matsch's approach in the summary judgment order exposes a potential latent tension: What if the district court finds a genuine dispute regarding liability-creating, immunity-defeating facts, but those facts are not the same that the plaintiff hopes to prove?

Upon further analysis, however, the Court is convinced *Walton* ultimately creates no tension with cases such as *Farmer*, and that, except in circumstances that do not apply here, *Farmer*'s description of the set of facts against which qualified immunity must be judged continues to control.

When *Walton* says that *Johnson* requires the appellate court to "take as given the district court's assessment of what facts a reasonable jury could accept," it cites page 317 of *Johnson*. The Court could locate nothing on page 317 that supports *Walton*'s characterization of *Johnson*. However, page 319 contains the phrase "take, as given, the facts that the district court assumed when it denied summary judgment." 515 U.S. at 319. This is obviously what *Walton* had in mind—it is the only place in *Johnson* that refers to "tak[ing]" anything "as given," and *Walton* even replicates *Johnson*'s lack of an indefinite article ("take as given" instead of "take as *a* given").

This portion of *Johnson* was addressing a specific counterargument made by the police officers in that case in an attempt to persuade the Supreme Court to allow interlocutory qualified immunity review even in "evidence sufficiency" cases. The argument was as follows:

> [I]f appellate courts try to separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is "genuine"), they will have great difficulty doing so. District judges may simply deny summary judgment motions without indicating their reasons for doing so. How, in such a case, will the court of appeals know what set of facts to assume when it answers the purely legal question about "clearly established" law?

*Id*. The Supreme Court answered the argument as follows:

> When faced with an argument that the district court mistakenly identified clearly established law, the court of appeals can simply take, as given, the facts that the district

> court assumed when it denied summary judgment for that
> (purely legal) reason.  Knowing that this is extremely helpful
> to a reviewing court, district courts presumably will often
> state those facts.  But, if they do not, we concede that a
> court of appeals may have to undertake a cumbersome
> review of the record to determine what facts the district
> court, in the light most favorable to the nonmoving party,
> likely assumed.

*Id.* (internal quotation marks and citation omitted).  Here, the Supreme Court states its expectation that district courts are assuming facts in the light most favorable to the nonmoving party.  There is simply no discussion—because it was not at issue—about district courts assuming some less favorable set of facts and still denying summary judgment.  Likewise, this was not a question in *Walton*, and so *Walton*'s "take as given" cannot be interpreted as a pronouncement that the Supreme Court requires appellate courts reviewing interlocutory qualified immunity questions to look at the facts as assumed by the district court *to the exclusion of* the facts in the light most favorable to the plaintiff.

There may be times when a district court explicitly rules at summary judgment that the *only* set of facts that can overcome qualified immunity is a set of facts different from what the plaintiff hopes to prove, but is nonetheless still provable.  Judge Matsch did not make such a ruling here.  In particular, when Judge Matsch said that Motyka might still be liable under a recklessness theory even if he had not been aiming at Valdez (ECF No. 124 at 5), or that an inference could be made that Motyka was firing without aiming at a clear target (*id.* at 3), Judge Matsch was not declaring that to be the only liability-creating, immunity-defeating theory a jury could reasonably accept.  He was simply responding to Defendants' theory—*which Defendants know to be inaccurate*—that Valdez was accidentally shot by Motyka when officers opened fire on

Johnny Montoya (again, it is beyond reasonable dispute that Motyka intended to shoot Valdez, that the bullet which struck Valdez in the back came from Motyka's firearm, that Johnny Montoya was shot dead about three minutes later, and that Motyka had withdrawn from the engagement before officers opened fire on Montoya).

Whether the undersigned would have concluded, as Judge Matsch did, that a hypothetical and knowingly counterfactual scenario might nonetheless create liability and defeat immunity is presently immaterial. The appropriate set of facts against which to judge qualified immunity on an interlocutory appeal is "the most favorable view of the facts to the plaintiff." *Farmer*, 288 F.3d at 1258. The summary judgment record shows that Valdez has evidence from which a reasonable jury could conclude that Motyka had time to discern, and did discern, that the immediate danger had passed; that Valdez was laying prone on the ground with his hands above his head; and that Motyka opened fire anyway, intending to hit Valdez. If a jury accepted this view of the evidence, it would demonstrate the violation of a right that was clearly established as of January 16, 2013. *See, e.g.*, *Garner*, 471 U.S. at 11 ("[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead"); *King v. Hill*, 615 F. App'x 470, 479 (10th Cir. 2015) (finding that a series of published cases established, as of 2010, "that an officer could not shoot an unarmed man who did not pose any actual threat to the officer or to others"); *see also Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) ("circumstances may change within seconds eliminating the justification for deadly force").

Of course, a jury could also accept many other views of the facts, including perhaps that Motyka (contrary to his stated position) was not intentionally aiming at

Valdez—which may raise a question of qualified immunity.[2]  But Defendants cite no authority, and the Court is aware of none, that the purpose of interlocutory qualified immunity review is to identify all possible variations of the facts where the law has not been clearly established.  If there is one version a jury could accept that would constitute a violation of a clearly established right, no interlocutory review is available and the case may be set for trial.  Defendants are free to propose any special interrogatories that they believe are necessary to preserve the qualified immunity defense.  *See* Fed. R. Civ. P. 49(a).[3]

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Plaintiff's Motion to Certify Defendants' Interlocutory Appeal as Frivolous (ECF No. 137) is GRANTED and the Court therefore re-assumes jurisdiction over this dispute;

2.    The stay of proceedings (ECF No. 142) is LIFTED; and

3.    No later than **September 30, 2019**, the parties shall contact the chambers of U.S. Magistrate Judge Scott T. Varholak to set a Final Pretrial Conference.

---

[2] It might also raise the question of whether an amendment to conform to the evidence should be allowed, *see* Fed. R. Civ. P. 15(b), to assert a substantive due process claim based on the theory that Motyka fired wildly in the direction of other humans without caring about what he might hit.

[3] To the extent any of this order should be construed as a Rule 62.1 indicative ruling, rather than a certification of frivolousness, it shall be so construed.

Dated this 26th day of September, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge