IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 15-cv-0109-WJM-STV

MICHAEL VALDEZ,

    Plaintiff,

v.

ROBERT MOTYKA, Jr., Denver Police Officer, in his individual capacity;
CITY AND COUNTY OF DENVER, a municipality,

    Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S RULE 702 MOTION

Plaintiff Michael Valdez ("Valdez") was shot in the back by Denver police officer Robert Motyka, Jr. ("Motyka"), at the end of a car chase in which occupants of the car Motyka was pursuing fired at Motyka and struck him in the shoulder. Valdez claims that Motyka's gunshot constituted excessive force in violation of the Fourth Amendment.

Currently before the Court is Valdez's Motion to Exclude Opinion Testimony. (ECF No. 113.) For the reasons explained below, the Court grants this motion in part as to Defendants' medical expert, Dr. Downs, and grants it in full as to Defendants' crime scene reconstruction expert, Mr. Martin.

## I. BACKGROUND

The Court draws the following facts from the summary judgment record, which clearly shows where the parties agree and disagree regarding the relevant facts. (*See* ECF Nos. 82, 92, 104.)

On January 16, 2013, Denver police received reports of a domestic violence incident and two shooting incidents, all involving a red Dodge pickup truck. The truck was spotted later in the day and a police chase ensued through the streets of north Denver. Valdez was a passenger in the truck.

One of the police pursuers, Motyka, was fired on from the truck. He says he saw two people from the truck firing at him, one of whom he is certain was Valdez. One of the bullets struck Motyka in the left shoulder, causing him to pull over and assess his injury momentarily, but he eventually joined other officers who had continued the chase.

The chase ended at Columbus Park when the truck collided with a tree on the edge of the park. The chasing officers, including Motyka, took up positions behind their cruisers, or the doors of their cruisers, some fifty to sixty feet behind the truck, with guns drawn.

Occupants of the truck began exiting. One of them fled into the park. Valdez says that he and a female occupant both exited the passenger side of the truck (the driver's side was smashed) and laid on the grass there in a prone position, with Valdez placing his hands on or above his head. Valdez says that, in this position, Motyka and another officer, John Macdonald, opened fire on him, with Motyka in particular motivated by revenge. Motyka says that Valdez did not lay on the ground, but got out of the truck and then began reaching back into the truck, which Motyka perceived as an action to retrieve the gun with which Valdez had been shooting at him. Motyka therefore opened fire, and Macdonald, who arrived seconds later, opened fire because Motyka opened fire.

One bullet, later established through ballistic evidence to have been fired by

Motyka, struck Valdez in the lumbar region, shattering a portion of his spine and temporarily paralyzing him. Another bullet tore off his left ring finger. No evidence could confirm who fired that bullet.

This lawsuit was presided over by Senior U.S. District Judge Richard P. Matsch until his passing in May 2019. In April 2019, Judge Matsch ruled that Macdonald was entitled to summary judgment, but that there were material disputes of fact preventing summary judgment as to Motyka and Denver. (ECF No. 124.) Defendants appealed the denial of qualified immunity as to Motyka. (ECF No. 128.) By order filed earlier today, the Court certified that appeal as frivolous pursuant to *Stewart v. Donges*, 915 F.2d 572 (10th Cir. 1990). (ECF No. 147.) Accordingly, the Court has jurisdiction to move forward with this lawsuit.

## II. LEGAL STANDARD

A district court must act as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004). Admission of expert testimony is governed by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

An expert's proposed testimony also must be shown to be relevant and otherwise

admissible. *See Adamscheck v. Am. Family Mut. Ins. Co.*, 818 F.3d 576, 588 n.7 (10th Cir. 2016). To be relevant, expert testimony must "logically advance[] a material aspect of the case" and be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (alteration in original).

## III. ANALYSIS

### A. Dr. Downs

Dr. J.C. Upshaw Downs is a medical doctor and forensic pathologist with extensive experience in areas such as identifying remains, determining cause of death, and evaluating certain kinds of causes of death. (*See* ECF No. 121-7.) Defendants have retained him mostly to provide a report about the angle at which Motyka's shot struck Valdez in the back, therefore providing information about Valdez's body position at the time of the shot. (*See* ECF No. 121-9.)

#### 1. Credentials

Valdez first asserts that "Dr. Downs possesses no expertise in firearms, bullet trajectory, ballistics, or crime scene reconstruction." (ECF No. 113 at 21.) Valdez therefore attacks Dr. Downs's credentials to testify as an expert on those subjects. (*Id.* at 21–22.)

Dr. Downs's CV does not explicitly call out any experience in bullet trajectory (the most relevant area of inquiry), although perhaps that is subsumed within some of his publications, many of which bear generic titles such as "Forensic Medicine," "Death Investigation," and "The Autopsy." (ECF No. 121-7 at 6–7.) However, as will become clear below, the only expertise Dr. Downs needs in this case to opine competently on bullet trajectory is the ability to understand what he is seeing on an x-ray and the ability

4

to operate the software through which he viewed x-rays of Valdez taken not long after he was shot.

Dr. Downs reaches an opinion about the angle at which Motyka's shot struck Valdez in the back by calculating the trajectory the bullet took through Valdez's body. The entry wound was in Valdez's lumbar region, just to the right of his spine, as shown by physical evidence (Valdez's clothing) and x-rays. (ECF No. 121-9 at 2.) The bullet then traveled through a part of his spine, creating bone and bullet fragments, and continued to travel through "internal tissues" until it came to rest just under the skin next to the left side of the pelvis. (*Id.*)

Calculating the angle of travel as compared to a level line created by the top of both sides of the pelvis (in other words, a two-dimensional perspective looking downward at a body lying flat) was relatively simple for Dr. Downs due to top-down x-ray imagery and other evidence clearly showing both the entry wound and the bullet in its resting place, coupled with the x-ray viewing software's ability to measure angles. (*Id.* at 3.) This angle was 30–35 degrees. (*Id.*)

Calculating the angle of travel as compared to looking at the body from the *side* was more difficult for Dr. Downs because no side-perspective x-ray was taken before the bullet was removed. (*Id.*) But, using the capabilities of the x-ray viewing software to align the top-down view (where the bullet is visible) with the side view and to match the scale of the two images, and using the bullet fragments near the spine (visible in both x-rays) as a means of double-checking the alignment and scale, Dr. Downs was able to approximate where the bullet would have been seen in the side view and, in turn, to estimate that the bullet traveled at a 40–50 degree downward angle from that

5

perspective. (*Id.* at 3–4.)

Valdez does not attack Dr. Downs's qualifications to understand what he is seeing when he looks at the x-rays, nor his qualifications to manipulate the x-ray viewing software to obtain the angle measurements. Accordingly, Valdez's challenge to Dr. Downs's qualifications fails.

2.  "Anatomic Position"

Valdez next attacks Dr. Downs's summary of his two angle-measurement conclusions, specifically its reference to "anatomic position":

> The above [calculations] establish[] that with [Valdez's] body in anatomic position, the shot entering the back would have been traveling at approximately a 30–35 degree downward angle (from right to left in anteroposterior view) and a 40–50 degree downward angle (from the back to front in lateral view).

(ECF No. 121-9 at 4.) Valdez argues that "anatomic position"—which he understands to be "body standing erect, hands to [its] sides, in a neutral position"—is completely divorced from the facts of the case because there is no evidence that Valdez was standing in that position when he was shot. (ECF No. 113 at 20–21, 23–24.)

Valdez misreads the significance of Dr. Downs's opinion. As Dr. Downs explains in a supplemental declaration—which Valdez does not challenge as, *e.g.*, untimely disclosed—"[r]eference to the anatomic position is a standard practice in the field of forensic medicine. It allows one reviewing a pathologist's findings to understand the trajectory of a bullet, or other wound, in reference to a fixed orientation of the body." (ECF No. 121-8 ¶ 12.) Thus, he says, "I did not assume that Mr. Valdez was standing erect with his hands to his sides in an anatomically neutral position at the time he was shot." (*Id.*)

6

In reply, Valdez insists that any opinion based on angles measured in an anatomically neutral position will mislead the jury. (ECF No. 123 at 5.) Valdez does not explain why, however, and his own theory of the case shows the possible relevance of Dr. Downs's measurements, depending on the view of the facts the jury accepts. In his amended complaint, Valdez alleges that he was shot "[w]hile prone on the ground with his face in the grass and his hands extended overhead . . . as he tried to shield his head from gunshots." (ECF No. 11 ¶ 21.) Valdez also testified at his deposition that "the rest of [his] body was on the ground," meaning everything but his arms and hands. (ECF No. 92-10 at 41.) Thus, even if the jury accepts that Valdez's arms and shoulders were not in an anatomically neutral position, there is at least some evidence that his lower back and hips were, given his claim that he was lying prone.

In briefing, Valdez speculates that "lifting his arms and hands naturally would arch his back and shift his torso, chest, back, shoulders, legs, and other body parts." (ECF No. 113 at 23.) All of this is possible, of course, depending on the way Valdez moved his arms and shoulders, but that is irrelevant. On the record before the Court, there is enough evidence for a jury to accept at least that Valdez's lower back and hips were in a neutral position as Valdez lay prone on the ground. Thus, Dr. Downs's angle measurements are grounded in a set of facts that the jury could accept, and his testimony is therefore helpful to understanding the case.

3. <u>Comparison to Valdez's Story</u>

Dr. Downs report next compares his angle measurements to Valdez's claims about the position and orientation of his body. Valdez testified at his deposition that his "feet were pointing towards however far the police car was from me," and that his head "was pointing towards [a] sidewalk" that was to the right of both him and Motyka. (ECF

7

No. 92-10 at 42.) In other words, he appears to be saying that the soles of his feet were facing Motyka, although perhaps at an angle. Dr. Downs opines that such a body position is not consistent with the bullet's trajectory through Valdez's body:

> With that reported location and position of the subject's body, the estimated angle of the shot within the body could not physically have happened with the shooter positioned as per the officer's statements and scene evidence. The subject's account cannot be true because if it were, the shot within his body would have been directed towards his head.
>
> The subject's description of this shot having been fired from behind him . . . while he was prone on the ground, with his head towards vehicle front, is inconsistent with the medical and physical evidence.
>
> If the shot in question were to have been fired from a position behind . . . the subject, the shot would have been directed . . . sharply upward within the subject's prone body [toward his head]; the shot was instead directed downward within the subject's body [toward his hip], refuting this claim.

(ECF No. 121-9 at 5–6.)

Valdez brings essentially two attacks on this opinion, which the Court will address in turn.

      a.    *Factual Basis*

Valdez argues that Dr. Downs starts from an erroneous factual assumption about the orientation of his (Valdez's) body. (ECF No. 113 at 24.) Valdez says that Dr. Downs is relying on "factually inaccurate stick-figure drawings" that Valdez drew at his deposition to show his position and orientation relative to the truck and the sidewalk. (*Id.*) Those drawing show that, while allegedly prone on the ground, Valdez's feet would have been facing mostly in the direction of Motyka, although perhaps a little to Motyka's left. (*See* ECF No. 121-9 at 6; *see also* ECF No. 121-3 at 7.) Thus, Valdez is trying to distance himself from his drawings, and he faults Dr. Downs for relying on them. He

8

says he "never claimed to the crude stick figure drawings were accurate," and that they are, in fact, "inaccurate estimations and cannot be relied on as scientific data." (ECF No. 113 at 15.)

Valdez, however, indisputably made the drawings. The Court is aware of no principle—and Valdez cites none—that a deponent must specifically testify that drawings made at a deposition are accurate. Presumably the oath that a deponent takes to tell the truth requires the deponent, if asked to illustrate something, to do it as accurately as the deponent's skills allow in the context of the question being asked. Defendants' counsel asked Valdez to make a simple drawing of where he and another occupant of the vehicle were laying relative to the truck and the nearby sidewalk, and Valdez complied. (*See* ECF No. 92-10 at 49–52.) It is unclear why Dr. Downs should be faulted for failing to predict that Valdez would later disavow the accuracy of his drawings. In truth, Valdez himself has never disavowed the drawings. The claim that the drawings are "inaccurate" is argument of counsel only. (*See* ECF No. 113 at 5, 15–16, 24–25.)

Moreover, regardless of Valdez's artistic skills, the drawing is generally consistent with his verbal testimony that his "feet were pointing towards however far the police car was from me," and that his head "was pointing towards the sidewalk." (ECF No. 92-10 at 42.) Accordingly, Dr. Downs's opinions do not lack a factual basis for assuming that Valdez's feet were generally oriented toward Motyka.

    b. *Credibility Determination*

Valdez also attacks Dr. Downs's opinion as one about credibility. (ECF No. 113 at 22.) Dr. Downs does not directly opine on credibility, *i.e.*, whether Valdez is a believable witness. But he does appear prepared to testify that the physical evidence is

9

"inconsistent with" or "refut[es]" Valdez's theory of the case, or that Valdez's "account cannot be true." (ECF No. 121-9 at 5, 6.)

Counsel for Defendants may properly ask Dr. Downs questions to the effect of, "If a person is prone on the ground with his feet generally pointing toward a police officer, and the police officer fires his weapon, striking the person in the back in the place where a bullet struck Mr. Valdez, would you expect to see the bullet come to rest in the person's left hip?" To such a question, Dr. Downs could appropriately give his opinion that one would expect to see the bullet come to rest (or perhaps exit) through some place higher up on the person's body. Similarly, counsel for Defendants may elicit Dr. Downs's opinions about the estimated angle at which the bullet traveled through Valdez's body and whether that angle could be achieved in a person oriented towards a gun in a manner that Valdez claims to have been oriented. However, the Court finds it at least unfairly prejudicial, *see* Fed. R. Evid. 403, to permit Dr. Downs to testify directly that Valdez's theory of the case cannot be true, or is refuted by the physical evidence, or words to that effect. Accordingly, this portion of Valdez's motion is granted in part and denied in part.

    c. *"Consistent With . . . Upright Position"*

Finally, as relevant here, Dr. Downs opines that

> The documented trajectory of the projectile within the subject's body is consistent with the subject having been struck by the bullet while in an upright position (standing or kneeling). This is consistent with the multiple other bullet strikes on the passenger side of the vehicle. This would account for the anatomically downward and leftward track within the subject's body and could be explained by the subject reaching towards the vehicle cabin when the injury was sustained. Such a position would also be consistent with the left finger injury occurring in close temporal proximity . . . .

(ECF No. 121-9 at 7.) The Court agrees with Valdez that this particular opinion is not supported by sufficient facts or data. It comes essentially out of nowhere. Presumably many conceivable positions are consistent with the bullet's trajectory, and so it appears that Dr. Downs is saying only that his measurements do not rule out Motyka's theory of the case. But Dr. Downs does not explain why that particular theory, among many, is more or less likely based on the physical evidence.

In addition, there is an unexplained inconsistency. Considering the relative locations of Valdez, Motyka, and the truck, the only way that a leftward-tracking bullet entry wound on the right side of the lower back could be consistent with reaching back into the cab of the truck is if Valdez kept his back to the truck and reached backward, essentially blindly—a highly unnatural position.

For these reasons, the Court finds that this opinion is inadequately supported and therefore inadmissible.[1]

**B.    Mr. Martin**

Mr. Thomas L. Martin is a crime scene reconstruction expert. The Court need not delve into his credentials, and the Court has no doubt of Mr. Martin's expertise in these matters. For the reasons explained below, however, his proposed opinions are inadmissible for reasons independent of his expertise.

   1.    <u>"The fact that Michael Valdez's DNA was not identified on any of the firearms recovered from the pickup truck does not necessarily mean Michael Valdez was not handling the gun and firing at police." (ECF No. 121-2 at 18.)</u>

Mr. Martin's opinion appears to be a sort of preemptive rehabilitation of Motyka.

---

[1] To the extent Valdez means to argue that any portion of Dr. Downs expert testimony that the Court will admit should nonetheless be excluded under Rules 402 or 403, the Court overrules that objection.

11

Motyka is certain that one of the people shooting at him from the Dodge pickup truck was Valdez, but Valdez's DNA was not found on any of the guns recovered from the scene. Valdez is sure to point out as much, not only to support his story that he was not one of the shooters, but also to suggest to the jury that Motyka's account cannot be believed. Therefore, Defendants have asked Mr. Martin to offer an opinion about the significance of not finding DNA on any of the weapons.

Importantly, Mr. Martin's opinion is not based on, *e.g.*, the difficulty of recovering usable DNA from metal firearms,[2] or some other information beyond the knowledge of a lay jury. Rather, Mr. Martin points out that a left-hand glove was recovered from the scene with a "bullet defect in the left ring finger"—the same finger where the second bullet hit Valdez—and so perhaps Valdez had been wearing that glove while firing the gun, and thereby preventing transfer of his DNA to the surface of the gun. (ECF No. 121-2 at 19.)

It is a matter of common sense that a glove could prevent DNA transfer, and so the jury needs no expert testimony on that. As for the remainder of Mr. Martin's opinion, he is simply acting "as a mouthpiece for counsel," which is not an appropriate use of expert testimony. *United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1252 (D.N.M. 2015). Counsel is free set up this theory regarding the left-hand glove through evidence, questioning, and argument, but offering an expert to testify on it would usurp the role of the jury.

    2.    <u>"There is no evidence that Lt. Mac[d]onald shot Michael Valdez." (ECF No. 121-2 at 20.)</u>

Valdez's challenge to this opinion is moot because it is now irrelevant in light of

---

[2] The Court has heard such testimony in other cases.

Judge Matsch's grant of summary judgment to Macdonald.  (*See* ECF No. 124 at 7–8.)

  3. <u>"Plaintiff's claim that he was lying face down on the ground with his face in the grass when he was shot by police, is not consistent with the scene evidence."  (ECF No. 121-2 at 20.) & "The path of the bullet that struck Michael Valdez in the back does not reconcile with Mr. Valdez's account of the events."  (ECF No. 121-3 at 3.)</u>

These opinions are largely derivative and duplicative of Dr. Downs's bullet trajectory analysis.  Moreover, the opinions all come back to the premise that "[b]ullets travel in straight lines."  (ECF No. 121-3 at 3.)  A lay jury does not need an expert to understand as much.  If Mr. Martin takes the stand to say that bullets travel in straight lines and therefore one should expect to see *x, y,* and *z* under various scenarios, Mr. Martin would once again be acting as a mouthpiece for counsel.  The inferences are all well within the competence of a lay jury.  Accordingly, Defendants' counsel may set up these theories for the jury's consideration through questioning, argument, and exhibits (including reasonable demonstrative exhibits), but Defendants may not present Mr. Martin as a mouthpiece vouching for any theory.

\* \* \*

For these reasons, Mr. Martin's expert opinions are excluded in their entirety.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Exclude Opinion Testimony (ECF No. 113) is GRANTED IN PART and DENIED IN PART to the extent stated.

Dated this 26th day of September, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge