**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 15-cv-0109-WJM-STV

MICHAEL VALDEZ,

      Plaintiff,

v.

ROBERT MOTYKA, Jr., Denver Police Officer, in his individual capacity;
CITY AND COUNTY OF DENVER, a municipality,

      Defendants.

---

**ORDER ON DENVER'S MOTION FOR SUMMARY JUDGMENT**
**AND RELATED MOTIONS**

---

Defendant Robert Motyka, Jr. ("Motyka"), a Denver police officer, shot Plaintiff Michael Valdez ("Valdez") at least once, and perhaps twice, at the end of a dramatic, drive-and-shoot car chase on the morning of January 16, 2013.  Valdez claims that Motyka opened fire after all danger had passed, in violation of the Fourth Amendment, because Motyka was angry and wanted revenge for having taken a bullet to the left shoulder during the car chase.  Invoking the municipal liability theory first endorsed by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), Valdez further claims that Motyka's actions are attributable to Defendant City and County of Denver ("Denver") through Denver's alleged lax enforcement of use-of-force policies, or to Denver's failure to properly train Motyka.  Motyka claims that he reasonably perceived Valdez as a lethal threat, so he was justified in subduing Valdez through lethal force.

This action was filed in January 2015 and was presided over by Senior U.S. District Judge Richard P. Matsch until his death in May 2019.  It was reassigned to the undersigned in July 2019.  In December 2019, the Court issued an order reopening discovery on Valdez's *Monell* claims, and then permitting Denver to file a summary judgment motion directed specifically at those claims.  *See Valdez v. Motyka*, 2019 WL 6838959 (D. Colo. Dec. 16, 2019) (ECF No. 158).

Now before the Court is Denver's Motion for Summary Judgment.  (ECF No. 181.)  Also before the Court are three related motions:

- Denver's Motion to Bifurcate Trial ("Motion to Bifurcate") (ECF No. 175), arguing that the Court should first hold a trial on Motyka's individual liability only, and then hold a *Monell* trial if Motyka is found liable;

- Denver's Motion to Strike (ECF No. 213), claiming that Valdez improperly introduced new evidence through his summary judgment response brief; and

- Denver's Motion for Leave to File Reply in Support of Motion to Strike ("Motion for Leave") (ECF No. 221).

For the reasons explained below, the Court grants Denver's Motion for Summary Judgment as to all but two of Valdez's *Monell* theories, denies the Motion to Bifurcate, denies the Motion to Strike as moot (because the evidence sought to be stricken would not be admitted at a trial anyway), and denies the Motion for Leave as moot.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  BACKGROUND

A complete account of the parties' competing versions of events may be found in prior orders (*e.g.*, ECF No. 152) and is unnecessary to repeat here.  For purposes of this analysis, the Court will assume Valdez's version of what happened on the morning of January 16, 2013.  More specifically, the Court will assume that:

- when the truck in which Valdez was a passenger crashed into a tree, ending the car chase, Valdez exited and immediately went to the ground in a prone position, with his hands raised over his head; but

- Motyka, motivated by anger and a desire to retaliate for being shot in the shoulder during the car chase, and with no legitimate public safety need, fired at Valdez at least twelve times.

3

It is undisputed that one of Motyka's bullets struck Valdez in the lower back.  A second bullet struck Valdez's left ring finger, severing it, but that bullet may have come from a different officer who also opened fire.[1]

### III. ANALYSIS

Valdez asserts two broad *Monell* theories: (1) an unwritten policy of tolerating excessive force, communicated (so to speak) to Motyka by Denver's failure to adequately investigate and discipline him for previous instances in which he allegedly used excessive force, thus emboldening him to use excessive force against Valdez; and (2) a failure to adequately train Denver police officers about how to handle the situation in which Motyka found himself, as evidenced by ten sub-accusations about Denver's allegedly inadequate policies or training programs.  The Court will address these theories in turn.[2]

### A.    Unwritten Policy of Tolerating Excessive Force

Previously, much of this case focused on whether Denver could be liable for having exonerated Motyka (and other participating officers) from any wrongdoing during the car chase or its aftermath.  *See Valdez*, 2019 WL 6838959, at *1–3.  The Court ruled that Denver's after-the-fact investigation could never be the *cause* of the actions under investigation, so that alone—what the parties have sometimes referred to as "ratification"—could not be the basis of Denver's *Monell* liability.  *Id.* at *4–6.  However,

---

[1] Judge Matsch granted that officer qualified immunity.  (*See* ECF No. 124 at 7–8.)

[2] A failure-to-investigate/discipline claim usually falls under the failure-to-train rubric. *See Trujillo v. City & Cnty. of Denver*, 2017 WL 1364691, at *4 (D. Colo. Apr. 14, 2017).  In other words, it appears that Valdez's first *Monell* theory might actually be another example of his second theory.  However, in light of the disposition of that theory below, it is immaterial whether Valdez's first claim should also be considered a failure-to-train claim.  *Cf. id.* (discussing the difference between failure-to-train claims and other forms of *Monell* liability).

although "an inadequate investigation [into allegedly unconstitutional conduct] cannot be the cause of the actions being investigated," "a pattern of inadequate investigation might be enough for a jury to infer the existence of an unwritten policy of tolerance toward actions contrary to the [municipality's] written policy." *Id.* at *6.

Apparently taking this as a cue, Valdez now reformulates his "ratification" theory as follows:

> "For at least 4 years before January 16, 2013, Denver had a custom of failing to investigate and discipline its employees in use of force cases which caused Mr. Motyka to not be disciplined, to remain on the force, and to feel emboldened after several excessive use of force cases including when he entered the home of Daniel Martinez Jr. without consent, punched 19-year old Nathan Martinez in the face and then arrested him without probable cause to do so on January 27, 2009 instead of being disciplined with corrective action or removal from the force such that he would not have engaged in the excessive use of force against Michael Valdez on January 16, 2013." (ECF No. 169 at 1–2.)

Much of the evidence Valdez hopes to present in support of this theory is evidence allegedly showing that the Denver Police Department does not do a good job in general when investigating complaints against its officers. (*See id.* at 2, ¶¶ a–b; ECF No. 195 at 29–31.) Valdez, however, does not allege that Motyka was aware of, and therefore emboldened by, his employer's allegedly inadequate investigations generally. Valdez instead alleges that Motyka was emboldened by inadequate investigations into his conduct specifically. Accordingly, Valdez's proposed evidence of what Denver did generally is irrelevant.

As to Motyka's conduct specifically, Valdez points to three incidents: the Nathan Martinez incident mentioned above, and "two other citizen use of force complaints [against Motyka] in the years 2009 and 2010." (ECF No. 169 at 4, ¶ k.) The Court will

address these in turn.

1.     The Nathan Martinez Incident

In January 2009, Motyka and other Denver Police officers entered a home based on what Valdez calls "stale information that its residents had engaged in misconduct." (ECF No. 169 at 2, ¶ c.)  "Once inside," Valdez continues, "Mr. Motyka punched 19-year old Nathan Martinez in the face and then placed him under arrest."  (*Id.*)  A Denver Police Department internal investigation exonerated Motyka "because no violation of DPD's use of force policy by Sgt. Motyka was established by a preponderance of the evidence."  (ECF No. 181 at 5, ¶ 9.)  Martinez and his family eventually filed a federal lawsuit against Motyka and others.  (ECF No. 169 at 3, ¶ h.)  The case went to trial and the jury found in Martinez's favor on his claim that Motyka had arrested him without probable cause.  (*Id.* ¶ i.)  However, the jury found *against* Martinez on his claim that Motyka had used excessive force.  (ECF No. 181 at 5, ¶ 11.)

The foregoing narrative, which is undisputed, shows that both the Denver Police Department and a civil jury decided that a preponderance of the evidence did *not* support the charge of excessive force against Motyka.  Accordingly, this incident has no probative value as to Denver's alleged failure to investigate and discipline Motyka for excessive force.

2.     "Two Other Citizen Use of Force Complaints"[3]

In April 2009, a citizen complained about being found by Motyka and another police officer hiding "in a trash can" (apparently hiding in a dumpster after a foot chase),

---

[3] The documents on which these accusations are based were filed under Restricted Access, Level 1.  The Court finds that the portions of these documents quoted or summarized below do not qualify for Restricted Access, given the need to provide a proper, publicly available explanation of the Court's decision.  *See* D.C.COLO.LCivR 7.2.

at which point Motyka and the other officer pulled him out of the dumpster, threw him to the ground, kicked and punched him in the head, and slammed his head into the ground, although he was not resisting arrest.  (ECF No. 172-3 at 6, 20.)  The Police Department investigated and then sent a letter to the complainant detailing its findings, including that the complainant's subsequent booking photos did not show any injuries consistent with his accusations.  (*Id.* at 4.)  The letter stated that the complainant could submit more information, but, "until then, this investigation [will] be closed."  (*Id.* at 5.)

In July 2010, a citizen complained that, while drunk, he had been contacted by Motyka and another officer, thrown to the ground, kicked by Motyka in the rib cage, and later backhanded in the face by Motyka for "asking too many questions."  (ECF No. 172-2 at 5.)  The Police Department investigated and then sent a letter to the complainant detailing its findings, including that his medical records were not consistent with his claimed injuries, but largely crediting the officers' accounts over the complainant's.  (*Id.* at 3.)  The letter culminated in a conclusion that "[n]o evidence could be found that indicated the actions of the Denver Police officers were in violation of the Denver Police Department['s] policies or procedures."  (*Id.* at 3.)

The problem for Valdez with both of these use-of-force complaints is that he has no evidence that the Police Department's investigations were inadequate under the circumstances.  Valdez instead relies on the mere fact that complaints were made and that they ultimately did not lead to discipline, as if that alone is enough for the jury to infer that what happened *between* the complaints and the ultimate decisions—*i.e.*, the investigations themselves—was inadequate.  Valdez cites no case law for that proposition, nor is the Court aware of any.  The case law is actually to the contrary,

requiring the plaintiff to show that the underlying complaints had some merit before it may be inferred from no-discipline findings that the municipality failed to investigate adequately.  *See, e.g.*, *Trujillo v. Campbell*, 2012 WL 3609747, at *7 (D. Colo. Aug. 22, 2012); *Gantos v. City of Colo. Springs Police Dep't*, 2008 WL 296291, at *9 (D. Colo. Feb. 20, 2008).  Valdez does not attempt to do so.

Consequently, these two incidents (singly, together, or together with the Nathan Martinez incident) have no probative value as to Denver's alleged failure to investigate and discipline Motyka for excessive force.

   3. <u>Type of Force in Question</u>

Finally, all three of the alleged excessive force incidents proffered by Valdez involved bodily force only (punching, kicking, etc.) in the process of taking someone into custody.  They do not establish a pattern of failing to investigate officers' choices to discharge their firearms, which is a materially different situation.  *Cf. Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) ("In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." (internal quotation marks omitted)).  For this reason as well, the Court finds that Valdez's evidence is not probative of the *Monell* theory he hopes to prove.

* * *

For the reasons explained above, Denver is entitled to summary judgment on Valdez's failure-to-investigate/discipline theory of *Monell* liability.

**B. Failure to Train**

A municipality may adopt what is, in effect, a "policy of inaction" in the face of

knowledge that municipal officials are routinely violating a specific constitutional right, thus becoming "the functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (internal quotation marks omitted). This is often known as a failure-to-train claim.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61. Thus, the fact

> [t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989).

Given all this, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate [the municipality's] deliberate indifference for purposes of [a] failure to train [claim]." *Connick*, 563 U.S. at 62 (internal quotation marks omitted). In *Connick* itself, for example, a pattern of previous violations of the duty to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), was not enough to put the local district attorney on notice of the need to train specifically regarding the need to disclose "blood evidence, a crime lab report, or physical or scientific evidence," which was the sort of evidence at issue there. *Connick*,

563 U.S. at 62–63.

However, the Supreme Court has "left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference," *id.* at 63, a concept known as "single-incident liability," *id.* at 64. Specifically, the Supreme Court stated in *City of Canton* that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  489 U.S. at 390.  "For example," the court elaborated,

> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n.10 (citation omitted).

### 1.  Need for Expert Testimony

Denver argues that "where the plaintiff's failure to train theory is based on [single-incident liability], expert testimony is necessary to establish a factual basis from which the court, or jury, could reasonably infer that training deviates from some widely accepted standard."  (ECF No. 181 at 23.)  Valdez responds that this is not a single-incident case, and further asserts that "[i]t does not take an expert to explain to a jury how Denver failed to adequately train its officers."  (ECF No. 195 at 36, 37.)

Denver's argument flows from *Brown v. Gray*, 227 F.3d 1278 (10th Cir. 2000), a case in which an off-duty police officer was found to have used excessive force, which

had in turn been caused by Denver's failure to train officers about the distinction between on-duty and off-duty conduct.  *See id.* at 1284–91.  The relevant portion, as it relates to Denver's argument, is a footnote in which the Tenth Circuit supposedly interpreted *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) ("*Tuttle*"), to mean that a plaintiff must offer expert evidence to prove single-incident liability.  *Brown*, 227 F.3d at 1287 n.3.

The question in *Tuttle* was whether a jury could infer from a single incident alone that a municipality had failed to train the officer properly.  471 U.S. at 812–14 (plurality op.).  A four-justice plurality answered "no," reasoning that "additional evidence" was needed—and, even though the jury had heard from the plaintiff's expert on police practices, the jury instructions nonetheless allowed the jury to infer failure-to-train from the "unusually excessive use of force" of the incident alone, and the instructions were therefore erroneous.  *Id.* at 821–22.[4]  A separate plurality (forming a majority) agreed on that basic point, although not always on the reasoning behind it.  *Id.* at 830–31 (Brennan, J., concurring in part and concurring in judgment).

Returning to the Tenth Circuit's *Brown* decision, the plaintiff there presented expert testimony about the problem of not training officers to handle off-duty situations.  227 F.3d at 1287.  Denver then made a convoluted argument that *Tuttle* had actually rejected expert testimony as a means of proving inadequate training.  *Id.* at 1287 n.3.  The Tenth Circuit responded that "the Supreme Court [in *Tuttle*] never found expert testimony to be insufficient in this context; to the contrary, it *required* such additional

---

[4] The jury instruction stated, "[A] single, unusually excessive use of force may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to 'deliberate indifference' or 'gross negligence' on the part of the officials in charge."  *Id.* at 813 (emphasis removed).

evidence for a jury to find municipal liability for a single incident of excessive force."  *Id.* (emphasis in original).  From this, Denver now derives the rule that single-incident liability requires expert testimony.

*Brown* did not interpret *Tuttle* to require expert testimony, but only to require more evidence than the perceived egregiousness of the single incident itself.  *See id.* And it is not clear that *Brown* was setting forth its interpretation of *Tuttle* as a holding to be followed, instead of rejecting Denver's meritless reinterpretation of *Tuttle*.  *Cf. id.* at 1286 n.2 ("We are compelled to point out that Denver's opening and reply briefs are replete with instances in which it misstates the law . . . .").

Thus, the Court reiterates that *Tuttle,* as clarified by *Brown*, does not stand for the proposition that expert testimony is in all instances required to establish municipal liability for a single incident of excessive force.  Nonetheless, the Court agrees with Denver more generally that a failure-to-train theory often requires expert testimony, whether or not the case is deemed a "single incident" case (as in *Tuttle* and *Brown*). Indeed, the Court is unaware of any failure-to-train case that did *not* involve expert testimony.  *See, e.g.*, *Tuttle*, 471 U.S. at 821–22; *Brown*, 227 F.3d at 1287; *Allen v. Muskogee*, 119 F.3d 837, 842–43 (10th Cir. 1997); *Zuchel v. City & Cnty. of Denver*, 997 F.2d 730, 738–43 (10th Cir. 1993).  On the other hand, *City of Canton*'s singe-incident example of giving officers firearms without training on when to use them shows that sometimes the failure to train can be *prima facie* deliberately indifferent, with (apparently) no expert testimony needed.  489 U.S. at 390 n.10.

The Court now turns to Valdez's specific failure-to-train theories, keeping in mind whether they may be appropriately presented to a jury through lay testimony and

attorney argument only.

    2.    <u>Valdez's Theories</u>

        (i)    "For at least 5 years before January 16, 2013, Denver had a policy of not training its police officers with clear criteria for the use of lethal force by an officer which caused Mr. Motyka to immediately engage the lethal force use of a handgun against Mr. Valdez instead of either refraining from the use of lethal force or relying on a less lethal alternative on January 16, 2013." (ECF No. 169 at 5.)

It is not clear how this theory connects to the allegation that Motyka opened fire out of anger. Whatever the connection, it is further unclear what Valdez means by "clear criteria for the use of lethal force." It is undisputed that, in 2013 and earlier (*i.e.*, the relevant time frame for this lawsuit), Denver trained its police officers regarding use of "deadly physical force" by quoting the then-current version of Colorado Revised Statutes § 18-1-707, as follows:

    1.  Except as provided in subsection (2) of this section, a peace officer is justified in using reasonable and appropriate physical force upon another person when and to the extent that he reasonably believes it necessary:

        a.  To effect an arrest or to prevent the escape from custody of an arrested person unless he knows that the arrest is unauthorized; or

        b.  To defend him self [*sic*] or a third person from what he reasonably believes to be the use or imminent use of physical force while effecting or attempting to effect such an arrest or while preventing or attempting to prevent such an escape.

    2.  A peace officer is justified in using deadly physical force upon another person for a purpose specified in subsection (1) of this section only when he reasonably believes that it is necessary:

        a.  To defend himself or a third person from what he reasonably believes to be the use or imminent use of

deadly physical force; or

b. To effect an arrest or prevent the escape from custody, of a person whom he reasonably believes:

1. Has committed or attempted to commit a felony involving the use or threatened use of a deadly weapon; or

2. Is attempting to escape by the use of a deadly weapon; or

3. Otherwise indicates, except through a motor vehicle violation, that he is likely to endanger human life or to inflict serious bodily injury to another unless apprehended without delay. . . .

(ECF No. 181-3 at 2.)[5]

Later in the same policy manual, Denver reiterated materially the same rules, but specifically in the context of use of firearms:

When all reasonable alternatives appear impractical, a law enforcement officer may resort to the lawful use of firearms under the following conditions when he/she reasonably believes that it is necessary:

a. To defend him/herself, or a third person from what he/she reasonably believes to be the use or imminent use of deadly physical force (C.R.S. §18-1-707 [*i.e.*, the same statute quoted previously]); or

b. To [e]ffect an arrest, or to prevent the escape from custody of a person whom he/she reasonably believes:

1. Has committed or attempted to commit a felony involving the use or threatened use of a deadly weapon; or

2. Is attempting to escape by the use of a deadly weapon; or

---

[5] Valdez inexplicably omits this portion of Denver's use-of-force policy in the copy of the document he submits to the Court. (*See* ECF No. 169-7.)  The Court therefore quotes the version attached to Denver's summary judgment response brief.

3. Otherwise indicates, except through a motor vehicle violation, that he is likely to endanger human life or to inflict serious bodily injury to another unless apprehended without delay. (C.R.S. §18-1-707).

4. The following definitions shall apply to all of OMS 105.04(3) a. and b:

   a. REASONABLE BELIEF:  When facts or circumstances the officer reasonably believes, knows, or should know, are such as to cause an ordinary and prudent police officer to act or think in a similar way under similar circumstances.

   b. DEADLY PHYSICAL FORCE:  That force, the intended, natural, and probable consequence of which is to produce death and which does, in fact, produce death.

   c. SERIOUS BODILY INJURY:  Bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk or protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures (to include breaks or fractures of hard tissue such as bone, teeth, or cartilage) or burns of the second or third degree.

5. It is necessary, "when feasible", to give some warning before engaging in the use of deadly force.  If possible, identify yourself as a police officer, give the command you want followed, and state your intention to shoot.

(*Id.* at 19.)[6]

Denver's policies were obviously based on, and perhaps more restrictive than,[7]

the relevant constitutional standard as pronounced by the Supreme Court:

---

[6] Again, Valdez omits this portion of Denver's use-of-force policy in the copy of the document he submits to the Court.  (*See* ECF No. 169-7.)

[7] Even the "PARC Report," which is among the materials Denver attacks through its Motion to Strike (*see* Part IV.A, below), acknowledges that Denver's policy "is commendably more narrowly drawn than federal constitutional law on the subject."  (ECF No. 195-13 at 31.)

> Where the officer has probable cause to believe that the
> suspect poses a threat of serious physical harm, either to the
> officer or to others, it is not constitutionally unreasonable to
> prevent escape by using deadly force.  Thus, if the suspect
> threatens the officer with a weapon or there is probable
> cause to believe that he has committed a crime involving the
> infliction or threatened infliction of serious physical harm,
> deadly force may be used if necessary to prevent escape,
> and if, where feasible, some warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985).  In this light, Valdez has failed to show

how "clear[er] criteria for the use of lethal force" (ECF No. 169 at 5) could have

prevented a violation *of the Constitution*.  Thus, this theory is of no probative value.

> (ii)   "For at least 5 years before January 16, 2013, Denver had a
> policy of not training its police officers to attempt to use less
> lethal force prior to using lethal force which caused
> Mr. Motyka to immediately engage lethal force of a handgun
> instead of attempting to use less lethal options or calling for
> a less lethal force trained officer to provide assistance on
> January 16, 2013."  (ECF No. 169 at 7.)

As before, it is unclear how this relates to a police officer who is allegedly

determined to shoot out of anger.  It is further unclear whether a municipality that

accurately trains its officers on the constitutional standard for use of deadly force

nonetheless undermines that training when it does not also train the officers on

techniques they might use instead of deadly force (whether or not deadly force is

appropriate).

In any event, Denver's policy specifically conditioned use of firearms on a

judgment that "all reasonable alternatives appear impractical."  (ECF No. 181-3 at 19.)

The policy further provided the following "list of use of force/control options" (although

the list was "not intended to suggest the order in which the various categories of force

should be used in any specific situation"):

> 1.   Command presence

      2.      Voice

      3.      Hand control

      4.      Chemical agent

      5.      Hand strike, leg thrust / kick

      6.      Baton / impact instrument

      7.      Carotid compression technique

      8.      R.I.P.P. restraint devices

      9.      Less lethal weapons[8]

      10.     Deadly force

      11.     Police service dog

(*Id.* at 5.)  The policy also stated, "When reasonable under the totality of circumstances, officers should use advisements, warnings, verbal persuasion, and other tactics and recognize that an officer may withdraw to a position that is tactically more secure or allows an officer greater distance in order to consider or deploy a greater variety of force options."  (*Id.* at 1.)  In a similar vein, the policy stated, "Officers should recognize that, when reasonable to do so with safety to officers and other persons in the vicinity, disengagement, repositioning, cover, concealment, barriers or retreat, although not required by law, may be a tactically preferable police response to a confrontation."  (*Id.* at 5.)

      Thus, the undisputed facts show that Denver trained its police officers to consider non-lethal seizure techniques, and required them to evaluate whether something less

---

[8] This is a defined term comprising "Electronic Restraints Devices (ERD/TASER), Pepper Ball deployment systems, less lethal twelve (12) gauge shotguns [*i.e.*, for shooting beanbag projectiles] and forty (40) mm projectile systems[,] and other[] [weapons] as approved by the Chief of Police."  (*Id.* at 8.)

than discharging a firearm was practicable.  This theory therefore has no tendency to show a *Monell* violation.

>    (iii)   "For at least 5 years before January 16, 2013, Denver had a policy of not training its police officers adequately in arrest control techniques (including verbal and non-verbal de-escalation techniques) which caused Mr. Motyka to fail to turn off his siren upon exiting his car, fail to identify himself, fail to give verbal commands to the truck occupants, fail to appropriately take cover, and fail to practice verbal and non-verbal de-escalation before using lethal force on Mr. Valdez on January 16, 2013."  (ECF No. 169 at 9.)

Yet again, the Court cannot see how this theory relates to Valdez's theory that Motyka was determined to shoot out of anger.  Indeed, it is especially unclear in this context because this theory appears to presume that Valdez really *was* a threat (not lying prone on the ground with his hands over his head) but could have been talked down.  Valdez has shown no indication of pursuing this as an alternative theory of liability.

Regardless, as noted in the previous subsections, Denver trains its police officers on alternatives to deadly force, and on "appropriately tak[ing] cover."  Whether Denver "adequately" trains its police officers in the listed techniques is beyond the competence of a lay jury, and Valdez has no expert witness on the subject.  Consequently, this theory has no tendency to show a *Monell* violation, and otherwise may not be presented at trial.

>    (iv)   "For at least 10 years before January 16, 2013, Denver had a policy of not training its police officers concerning whether to approach a subject, to stay in place, to order the subject to come closer to the officer, or to bridge the distance between the officer and the subject, which caused Mr. Motyka to recklessly approach the truck and start firing on the occupants rather than remaining behind the cover of a police vehicle and issuing verbal commands on January 16, 2013."  (ECF No. 169 at 11–12.)

For the fourth time, the Court sees no connection between this theory and Valdez's claim that Motyka opened fire out of anger.  In any event, Denver trains its officers on the option to retreat to a more secure location, as already described above.  This theory also appears to presume that it was Denver's duty to train officers in great detail about the myriad and endlessly unpredictable situations they might face.  That is not Denver's duty.  *See City of Canton*, 489 U.S. at 390–91.  For these reasons, this theory has no tendency to show a *Monell* violation.

> (v)     "For at least 5 years before January 16, 2013, Denver had a policy of not training its police officers that force will not be used as a means of retaliation, punishment or unlawful coercion, which caused Mr. Motyka to shoot Mr. Valdez out of anger and an intent to retaliate against or punish all of the truck's occupants for the gunshot wound he sustained instead of dis-engaging and allowing other on-scene officers handle the pursuit and scene control on January 16, 2013." (ECF No. 169 at 12.)

This theory, unlike those before it, appears relevant to the facts of this case as Valdez intends to prove them.  Denver responds that its use-of-force policy "provides the criteria under which its officers can use lethal force and requires the presence of an imminent threat of death or serious bodily injury to the officer or a third party.  Thus, the policy and attendant training make clear that an officer cannot use lethal force simply because they are angry."  (ECF No. 181 at 33 (citation omitted).)  The Court believes, however, that Denver underestimates the significance of the argument.

It is not beyond the province of a lay jury to infer that police officers, when shot at (and especially when struck), will react angrily and conflate what has already happened to them with probable cause to use deadly force, regardless of whether circumstances have changed since being shot at.  *See Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013) (force that is initially reasonable may become unreasonable through

changed circumstances); *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1315 (10th Cir. 2009) ("Another important aspect of [the excessive force] inquiry is whether the officers were in danger at the precise moment that they used force." (internal quotation marks omitted)).

In other words, a reasonable jury could conclude, through common experience and common-sense inferences, that it is "so obvious" that some police officers, once shot at, will believe that the shooter is inviting a gunfight and is therefore fair game for deadly force *no matter what happens next*, such that failure to train police officers in this regard "could properly be characterized as deliberate indifference to constitutional rights." *City of Canton*, 489 U.S. at 390 n.10 (internal quotation marks omitted). Indeed, in an internal interview following the January 2013 incident, Motyka described his actions and observations as he arrived at the scene where the truck had crashed into a tree, and he told his interviewer, "I was carrying my probable cause in my shoulder and the windshield of my police car." (ECF No. 92-1 at 10.)

Denver further responds, however, that this theory "is precluded by the well-settled principle that an officers' subjective motivations are irrelevant to the question of whether a use of force is reasonable." (ECF No. 181 at 33.) If Denver succeeds in convincing a jury that Motyka's use of force was objectively reasonable, then Denver is correct that Motyka's subjective retaliatory motive (assuming he had one) does not convert the force from reasonable to unreasonable. But that is beside the point. A jury could find that Denver must have known that officers are likely react angrily to being shot at, and that they may therefore assume that probable cause to use deadly force exists until the suspect has been subdued, even when circumstances have changed

since being shot at.

For these reasons, Denver is not entitled to summary judgment on this *Monell* theory.

> (vi)   "For at least 10 years before January 16, 2013, Denver had a policy of failing to train its officers on proper procedures to employ following an injury, which caused Mr. Motyka to unnecessarily re-engage in a vehicle pursuit and react to a non-existent threat from the truck's occupants instead of dis-engaging and allowing other on-scene officers handle the pursuit and scene control on January 16, 2013." (ECF No. 169 at 13.)

Valdez does not explain what the "proper procedures to employ following an injury" would be (always disengage? sometimes disengage?), nor does he have an expert to present those procedures to a jury. Valdez further does not present evidence that the alleged lack of such training has created problems in the past, to which Denver could be deliberately indifferent by not implementing such training; nor does he explain why the need for such training (whatever its content) is so obvious that liability can flow to the municipality even if the municipality has never previously had a problem with an injured officer re-engaging a pursuit.

Ultimately, this theory is in the same vein as theory "(iv)," above, in which Denver supposedly has a duty to train its officers in considerable detail about every situation that may arise. The Court disagrees. At some point, Denver is entitled to rely on officers' on-the-scene judgment.

For these reasons, this theory has no tendency to show a *Monell* violation.

> (vii)   "For at least 5 years before January 16, 2013, Denver had a policy of failing to train its police officers concerning threat assessment of bystanders, which caused Mr. Motyka to engage in tunnel vision and shoot at Mr. Valdez before appropriately assessing that Mr. Valdez was unarmed, engaged in surrendering, and posed no threat to him and on

January 16, 2013."  (ECF No. 169 at 13.)

This is an additional theory that has no apparent connection to Motyka's motive to shoot Valdez out of anger.  It is further divorced from the facts of this case because, regardless of whether Valdez posed a perceptible threat, no reasonable jury could find that Motyka should have perceived Valdez as a "bystander."  Valdez exited the truck from which someone had been firing at police, including Motyka himself.  No training about "threat assessment of bystanders" would have been relevant to the situation Motyka faced.  And, regardless, Denver trains its officers that they may not discharge their weapons "[w]here there is likelihood of serious injury to persons other than the person to be apprehended."  (ECF No. 181-3 at 20.)  Thus, this theory has no tendency to show a *Monell* violation.

> (viii)   "For at least 5 years before January 16, 2013, Denver had a policy of not training its police officers by failing to train and refresh officers concerning stress inoculation which caused Mr. Motyka to react angrily, assume that a gunfight was going to occur, refrain from giving commands and instead instigate the use of firearms instead of responding by remaining under cover of his police vehicle, conducting a threat assessment, and issuing surrender commands before firing his weapon on January 16, 2013."  (ECF No. 169 at 14.)

The concept of "stress inoculation" is beyond the capacity of a lay jury, and so Valdez may not pursue this theory to the extent he intends to rely on that concept.  The Court otherwise regards this theory as an elaboration on theory "(v)," regarding the likelihood that officers may react angrily to being shot at and therefore distort or disregard the probable cause standard.  For the same reasons that theory "(v)" may go forward, Denver is not entitled to summary judgment on this theory.

> (ix)   "For at least 5 years before January 16, 2013, Denver had a policy of not training its officers by failing to adequately train

> officers in force-on-force live decisional shooting scenarios which caused Mr. Motyka to immediately begin shooting on Mr. Valdez instead of non-reactively responding on scene by communicating and coordinating effectively with his on-scene colleague, appraising the absence of any threat, issuing appropriate commands, and refraining from shooting Mr. Valdez on January 16, 2013."  (ECF No. 169 at 15.)

Once again, this theory seems divorced from the overall theory that Valdez shot out of anger.  Moreover, it is undisputed that, at least from 2007 to 2012, Denver required regular in-service handgun training that "included live-fire situational-based training" using a "computer program that works in conjunction with the video projection system to allow the trainer to play different scenarios using images of real people in real settings on a large paper screen and adjust the scenarios based on the officer's tactics." (ECF No. 181 at 10, ¶ 32; *see also* ECF No 195 at 9, ¶ 30.)  The scenarios required the officer in training to "react as they would during an actual police encounter," including, among other things, "issuing commands," and "when appropriate, to attempt to obtain a suspect's compliance" without lethal force.  (ECF No. 181 at 10, ¶ 33.)

In this light, Valdez must necessarily accuse Denver of "failing to *adequately* train officers" (emphasis added).  Whether training such as this was adequate, either in content or frequency, is beyond a lay jury's competence, and Valdez has no expert on this subject.[9]  Accordingly, this is not a theory Valdez may pursue at trial.

> (x)    "For at least 5 years before January 16, 2013, Denver had a policy of not training its officers by failing to adequately train officers in live fire training simulations which caused Mr. Motyka after exiting his vehicle to immediately begin shooting on Mr. Valdez instead of non-reactively responding on scene by communicating and coordinating effectively with

---

[9] Indeed, even Valdez's basic concept—"force-on-force live decisional shooting scenarios"—may be beyond a lay jury's competence, depending on what Valdez means by that (and if he means something technical, he has no expert to explain it).

his on-scene colleague, appraising the absence of any threat, issuing appropriate commands, and refraining from shooting Mr. Valdez on January 16, 2013."  (ECF No. 169 at 16.)

The analysis of this theory is the same as for the immediately preceding theory. For the same reasons, Valdez may not pursue this theory at trial.

* * *

In sum, a reasonable jury could find in Valdez's favor on his *Monell* theories labeled "(v)" and "(viii)," above.  Denver is otherwise entitled to summary judgment on Valdez's *Monell* claims.

## IV.  MOTION TO STRIKE

In the Motion to Strike, Denver claims that Valdez has improperly introduced new evidence in response to summary judgment.  (ECF No. 213 at 3.)  Denver argues that Valdez accordingly violated his disclosure and discovery obligations, and Denver moves under Rule 37 for exclusion of this evidence.  For the reasons explained below, however, the Court finds that none of the new evidence saves any *Monell* theory on which the Court will grant summary judgment, nor supports either of the two theories on which the Court will deny summary judgment.  Accordingly, the Court will simply exclude the evidence as irrelevant, rather than as a discovery sanction.

## A.    PARC Report

In June 2008, an outside consulting entity known as the Police Assessment Resource Center ("PARC") produced a report commissioned by Denver's Office of the Independent Monitor ("PARC Report").  (*See* ECF No. 195-13 at 12.)  The PARC Report states its purpose as follows: "Through the prism of 25 officer-involved shootings, PARC has analyzed whether the DPD's [*i.e.*, Denver Police Department's]

policies, training, and practices comport with the best learning nationally on evaluation and management of deadly force and the avoidance of unnecessary or ill advised shootings." (*Id.* at 16.)

PARC concluded that "the DPD today meets and even exceeds national standards in many areas, making the DPD one of a handful of American police departments becoming a national leader." (*Id.*)  It nonetheless found that "Denver's policies do not always reflect the thinking and advances in policy development in other law enforcement agencies over the last few years." (*Id.* at 18.)  PARC therefore offered recommendations on numerous aspects of use of force and associated topics, including deadly force, disengagement, drawing and displaying firearms, tasers, foot pursuits, and police dogs.  (*Id.* at 27–75.)

The PARC Report does not help any of Valdez's theories.  First, the Report is self-evidently aimed at supra-constitutional best practices, not constitutional requirements.  (*See, e.g.*, *id.* at 16–18, 28 n.6, 31.)  *Cf. Tanberg v. Sholtis*, 401 F.3d 1151, 1164 (10th Cir. 2005) ("Although plaintiffs frequently wish to use administrative standards, like [police standard operating procedures], to support constitutional damages claims, this could disserve the objective of protecting civil liberties.  Modern police departments are able—and often willing—to use administrative measures such as reprimands, salary adjustments, and promotions to encourage a high standard of public service, in excess of the federal constitutional minima.  If courts treated these administrative standards as evidence of constitutional violations in damages actions under § 1983, this would create a disincentive to adopt progressive standards.").

Second, the Court has found nothing in the PARC Report that addresses

anything close to the circumstances allegedly at issue here: a wounded officer with an incentive to retaliate.

Third, the PARC Report is hearsay if offered for its truth, and the Court sees no relevant reason to offer it for other than its truth.[10]  It is also the sort of hearsay that tends to be admissible only through an expert witness.  *See* Fed. R. Evid. 703.  Valdez has no expert witness.

Thus, the Court need not decide whether the PARC Report should be stricken as untimely disclosed because it is irrelevant and inadmissible regardless.

**B.      *Zuchel***

Valdez also points to a letter appended to the Tenth Circuit's opinion in *Zuchel*. The basic facts of *Zuchel* were as follows:

> In the early evening of August 6, 1985, Leonard Zuchel created a disturbance at a fast food restaurant.  The manager called the police, but Zuchel left the restaurant before they arrived.  Officer Spinharney and his partner, Officer Teri Rathburn Hays, answered the call.  The manager told them that Mr. Zuchel had gone around the corner and the officers went looking for him.  In the meantime, Mr. Zuchel had become involved in a heated exchange with four teenagers on bicycles.  When the officers approached Mr. Zuchel and the teenagers, one of them shouted that Mr. Zuchel had a knife.  As the officers walked toward Mr. Zuchel and he turned toward them, Officer Spinharney shouted at Mr. Zuchel and then shot him four times.  A pair of fingernail clippers was found near Mr. Zuchel's body.

997 F.2d at 735.  The county coroner testified that "Mr. Zuchel's right arm, rather than being extended out toward Officer Spinharney, was directly across his chest when he

---

[10] Valdez may believe it is relevant to Denver's notice of alleged deficiencies, but such notice is irrelevant unless Valdez can show that the PARC Report indeed points out deficiencies—or in other words, that the PARC Report is true.

was shot in the chest while facing Officer Spinharney.  This evidence indicates that Mr.
Zuchel was not approaching the officer with his arm extended in a threatening manner."
*Id.* at 736.  At trial, the jury found that Officer Spinharney had used excessive force, and
the Tenth Circuit upheld that finding.  *Id.*

The jury also concluded that Denver was liable for its failure to adequately train
Officer Spinharney.  *Id.* at 737.  In reviewing this finding, the Tenth Circuit focused on a
letter written in 1983 by then-Denver DA Norman Early, sent to then-Denver police chief
Art Dill, which was introduced into evidence.  *Id.*  The letter referred to "five instances in
which citizens have been injured or killed by peace officers, and one in which an officer
was seriously injured" in the first six weeks of 1983.  *Id.* at 737–38.  "The general tenor
of this letter," said the Tenth Circuit, "as well as the fact that six police-citizen
encounters involving deadly force had occurred within a six-week period, support a
reasonable inference that such encounters were a usual and recurring problem."  *Id.* at
738.  "Mr. Early also stated in trial testimony that it was foreseeable that officers would
be placed in situations where they would have to make split second decisions on
whether to shoot."  *Id.*  Finally, a police practices expert, "Mr. Fyfe," likewise testified
that police officers in big cities "will run into situations where they're going to have to
make judgments as to whether or not to shoot."  *Id.* (internal quotation marks omitted).
The Tenth Circuit concluded that this evidence was enough to "support[] the jury's
determination that deadly force encounters are a usual and recurring circumstance
facing Denver police officers," thus satisfying that element of the failure-to-train claim as
set forth in *City of Canton*.  *Id.* at 734, 738.

As to the next elements—whether "Denver's police training program was

inadequate," and whether "any inadequacy was directly linked to Officer Spinharney's unconstitutional use of excessive force"—the Tenth Circuit focused on evidence regarding "live 'shoot-don't shoot' training on a target range." *Id.* at 738. Early's letter recommended such training. *Id.* The evidence showed, however, that Denver's shoot-don't shoot training comprised (at the relevant time) "a lecture and a movie" at the police academy, and "periodic[] retrain[ing]" using the same method. *Id.* at 739. The evidence further showed that Officer Spinharney had received only the police academy version of the training. *Id.* Mr. Fyfe, the police practices expert, testified that Denver's training had been "grossly inadequate," and that "the lack of live range training *alone* rendered Denver's training program inadequate." *Id.* (internal quotation marks omitted; emphasis in original). The Tenth Circuit found that this evidence was enough for a jury to conclude that Denver's lack of training caused Officer Spinharney to shoot when he should not have. *Id.* at 740.

Finally, as to Denver's deliberate indifference, the Tenth Circuit focused again on the Early letter and Mr. Fyfe's testimony to uphold the jury's finding that Denver knew its police officers were facing a recurring situation that could lead to constitutional violations, but it chose to do nothing about it. *Id.* at 740–41.

The Tenth Circuit also reproduced the entire Early letter as an appendix. *Id.* at 746–48. Mr. Early made several recommendations, "recogniz[ing] that some of these suggestions deal with items which are already in place within the Denver Police Department. In such instances, my suggestion would be that some attention be given to expanding their use." *Id.* at 747. Among his recommendations were the following:

1. Training upon entry and periodically thereafter.

A. Strategic skills development; how to analyze

situations, develop options, and select the option that
minimizes the likelihood of a violent confrontation.

B. Periodic target course "shoot-don't shoot" live training
under street conditions, particularly for officers on the
front line.

C. Ongoing physical conditioning and training in arrest
and defense techniques to ensure proper safety and
reduce the likelihood of escalating force.

D. Street survival.

E. Law relating to the use of force.

F. Individual case training at rollcalls.

2. Testing upon entry and periodically thereafter.

A. Written testing on law and procedures.

B. Use of firearms.

C. Target course shoot-don't shoot.

D. Judgment and strategic skills.

E. Stress testing.

*Id.* at 747–48.

Valdez emphasizes *Zuchel* for two propositions.  First, he says that, "[a]t least by
1993 [apparently mistaking the date of the *Zuchel* opinion for the date of the incident
that led to the *Zuchel* lawsuit, 1985], Denver was on notice of the need for periodic
appropriate decisional shooting training to ensure that officers do not shoot [an]
unarmed person[] with their hands in the air, whose back is to the officers when they
approach."  (ECF No. 195 at 20, ¶ 42.)  Second, he says that "[a]s far back as 1993
[apparently mistaking the date of the *Zuchel* opinion for the date of the Early letter,
1983], . . . Denver was made well aware of the need for robust training in the area of
use of force, especially deadly force."  (*Id.* at 31.)  Valdez then reproduces the same

recommendations from the Early letter that the Court has block-quoted immediately above.  (*Id.* at 31–32.)

     *Zuchel* does not help Valdez's *Monell* theories.  First, the simple fact that *Zuchel* was about a person with his hands in the air, whose back was to the officers when they approached, does not show "the need for periodic appropriate decisional shooting training to ensure that officers do not shoot" such persons.  (ECF No. 195 at 20, ¶ 42.) Nothing in *Zuchel* shows that the jury, the district court, or the Tenth Circuit found any significance in that *specific* scenario.  The focus was more generally on whether Denver police officers had been adequately trained to make proper use-of-deadly-force decisions, particularly when they have information that the suspect is *armed.*

     As for the *Zuchel* appendix (*i.e.*, the Early letter), the Court first cannot see how Valdez will properly introduce it into evidence.  Valdez offers no authority for the notion that evidence reprinted in a judicial opinion is thereby *per se* admissible.  And Valdez does not list Mr. Early as a trial witness.  (*See* ECF No. 152 at 20–22.)

     Even if the Early letter can be evidence of some sort by virtue of being reprinted in *Zuchel*, the Tenth Circuit endorsed only its recommendation that Denver provide live, scenario-based "shoot-don't shoot" training to police officers.  The Tenth Circuit did not endorse it more generally than that.  As already explained, Denver, at the relevant time before Motyka shot Valdez, provided the sort of training it lacked at the time of the Early letter.

     Moreover, the Early letter states that Denver had already implemented some of the training recommendations, but it does not identify those already-implemented measures.  Therefore, it is not competent evidence of what Denver was *not* doing,

except in the shoot-don't shoot instance.

Finally, the Court finds that the Early letter is so far removed in time (thirty years) from the incident leading to this lawsuit that whatever probative value it has is substantially outweighed by its likelihood to confuse the issues.  *See* Fed. R. Evid. 403.

Thus, the Court need not decide whether the Early letter should be stricken as untimely disclosed because it is irrelevant and inadmissible regardless.

**C.     Other Incidents**

Valdez offers the following use-of-force incidents as additional support for his *Monell* theories:

> On July 5, 2003, DPD officer James Turney shot and killed developmentally-disabled 15 year-old Paul Childs, while two other officers were in the house with less-lethal tasers they did not use.  Denver settled with the Childs family for $1.32 million.

> * * *

> On July 11, 2004, Frank Lobato was asleep when DPD officers entered his home without a warrant looking for a suspect.  DPD officer Ranjan Ford killed Mr. Lobato, who he claimed was holding a weapon.  In fact, Mr. Lobato was holding a soda can at the time of his death.  Denver settled with the Lobato family for $900,000 in 2007.

> * * *

> In September 2008, DPD officers Hamel and LeTendre shot unarmed Joseph Loera three times in the stomach and leg. Officers claimed Mr. Loera said he was going to kill them, but witnesses denied hearing this.  Officers claimed he reached for a gun, but only a flip-phone was found near Mr. Loera.

> On December 29, 2008, Samson Ferde was shot by officers responding to a relative concerned for his mental health. Officers ordered him to his knees, to which he complied, then to the ground.  Officer claimed that he then charged at him with something black in his hands and so shot him three

times, causing paralysis from spinal damage.  He was found at scene with two key rings, a crucifix, a flip cellphone, and no weapon.

On May 15, 2009, Odiceo Valencia-Lopez's family called for an ambulance due to his self-inflicted knife wound to his wrist.  He was standing by his vehicle with the knife in his hand when he was surrounded by 6-8 DPD officers with their weapons drawn.  The officers ordered him to drop his knife but he did not understand their commands.  An officer tased him after which he dropped his knife, but then the other officers then shot him seven times in front of his family.  Denver settled the case for an unknown amount in March 2010.

In December 2009, the family of Jason Gomez sued Denver based on fact that DPD Timothy Campbell shot him to death in the back when he was unarmed and surrendering.  Mr. Gomez had been pursued by Campbell who observed him driving "erratically" before parking in an apartment lot.  Campbell pursued Gomez, ordered him to kneel on the ground and pointed his gun at him.  When the unarmed Gomez stood up and ran, Campbell fatally shot him in the back.  The bullet perforated Mr. Gomez's spinal column, after which Campbell fired a second round of shots which hit Mr. Gomez twice in the chest and once each in his abdomen, right thigh and knee.  Campbell claimed Mr. Gomez was armed, but he was found to have been holding a BIC lighter.  Denver settled the case in December 2012 for $190,000.

On July 2, 2010, bystander Diamond Demmer was shot by Officer Robert Fitzgibbons.  Fitzgibbons was then firing on Sorl Shead, who was shooting a gun in the air, at the busy intersection of 11th and Broadway.  Fitzgibbons was using unauthorized hollow-point bullets, and Ms. Demmer, one of the innocent bystanders, was hit with multiple projectiles and fragments from Fitzgibbons' gun.  The City settled with Ms. Demmer on May 5, 2012 for $40,000.

(ECF No. 195 at 13, 16–17, ¶¶ 1, 3, 18–22 (citations omitted).)

These incidents of police excessive force and violence are troubling in the extreme.  The Court does not mean to diminish the seriousness of wrongful uses of deadly force, and these examples show that use of deadly force has happened in

circumstances suggesting that the use was wrongful (although there was no finding of liability in any of them, and Valdez naturally omits instances in which deadly force was likely justified).  However, none of these scenarios come close to the scenario that Motyka faced on the morning of January 16, 2013, even under Valdez's view of the facts.  Thus, testimony or evidence about these incidents would not tend to show that Denver inadequately trained Motyka to face the situation he actually faced when he shot Valdez.  The Court therefore finds evidence of these incidents inadmissible, and need not consider whether the evidence should be stricken as a discovery sanction.

## V.  MOTION TO BIFURCATE

The Court now turns to Denver's Motion to Bifurcate, which argues that the Court should first try Valdez's claim against Motyka, and then, if the jury finds Motyka liable, hold a second trial on Valdez's *Monell* theories.

### A.    Legal Standard

Federal Rule of Civil Procedure 42(b) provides the district court with broad discretion to order a separate trial of one or more separate issues or claims "[f]or convenience, to avoid prejudice, or to expedite and economize."  *See also United States ex rel. Bahrani v. ConAgra, Inc.*, 624 F.3d 1275, 1283 (10th Cir. 2010).  The decision to bifurcate a trial "must be made with regard to judicial efficiency, judicial resources, and the likelihood that a single proceeding will unduly prejudice either party or confuse the jury."  *York v. AT&T*, 95 F.3d 948, 957–58 (10th Cir. 1996).  "Bifurcation is not an abuse of discretion if such interests favor separation of issues and the issues are clearly separable."  *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 964 (10th Cir. 1993).  But bifurcation may be an abuse of discretion if it is unfair or prejudicial to a party.  *See id.*

33

**B.    Analysis**

Denver's motion leans heavily on the assumption that Valdez's *Monell* theories are so expansive that they will predominate, that they cannot possibly tried in the twelve days allocated to this case, and that they will inundate the jury with evidence (such as about training practices) that is not relevant to whether Motyka reasonably perceived Valdez as a threat justifying use of deadly force.  (ECF No. 175 at 8–9, 11.)

The Court, however, has limited Valdez to two *Monell* theories (which are arguably a single theory), and the evidence with which he may pursue those theories is relatively straightforward, not voluminous.  Moreover, in the Court's view, Valdez's remaining *Monell* theories are closely connected to his individual liability theory against Motyka.  The Court finds that it would not be an appropriate use of discretion to bifurcate in these circumstances.[11]

## VI.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Denver's Motion for Summary Judgment (ECF No. 181) is GRANTED IN PART and DENIED IN PART, as set forth above;

2.    Denver's Motion to Bifurcate Trial (ECF No. 175) is DENIED;

3.    Denver's Motion to Strike (ECF No. 213) is DENIED AS MOOT; and

4.    Denver's Motion for Leave to File Reply in Support of Motion to Strike (ECF No. 221) is DENIED AS MOOT.

---

[11] The Motion to Bifurcate argues that bifurcation of individual § 1983 claims from *Monell* claims has become somewhat standard, because in many instances a finding of no liability on the individual claim obviates any trial on the *Monell* claim.  (ECF No. 175 at 5–7.)  The Court need not address whether such bifurcation has actually become as commonplace as Denver represents.  In the circumstances of this case, bifurcation is not warranted.

Dated this 13th day of July, 2020.

BY THE COURT:

William J. Martinez
United States District Judge