# EXHIBIT 2



November 5, 2021

Jeffrey S. Pagliuca
Haddon Morgan and Foreman, P.C.
150 East 10th Avenue
Denver, CO 80203
jpagliuca@hmflaw.com
*Via Email Only*

RE: Expert Opinion Re: *Valdez v. Motyka, et. al.*

Dear Mr. Pagliuca:

Your office has retained me to provide an expert opinion regarding the reasonableness of the fees and costs associated with the *Valdez v. Motyka, et. al.*, Case No. 15-CV-109-WJM (D. Colo.). My hourly rate for this matter is $350. Exhibit A is my curriculum vitae. Exhibit B lists the information upon which I relied in preparing these opinions.

## I. FACTUAL BACKGROUND

I understand that on January 16, 2013, around 3:00 p.m. in Northwest Denver, Michael Valdez accepted a ride in a red pickup truck with three childhood acquaintances–Johnny, Chuck, and Jude Montoya–and a fourth person he did not know, Alyssa Moralez.

Soon after Mr. Valdez jumped into the truck's bed, the police began chasing the vehicle and shooting at it. Mr. Valdez was not aware that, earlier that day, the Montoyas perpetrated multiple gun related crimes, causing police to be on the lookout for the Montoyas and their pickup.

During the police chase, Mr. Valdez sought safety from the gunfire by crouching in the pickup bed then crawling into the cab of the truck to hide. When he crawled into the cab, Mr. Valdez helped protect Ms. Moralez–a woman he'd never met before–by covering her and pushing her down onto the floorboard.

During the pursuit, Chuck Montoya and Jude Montoya shot at responding officers as Johnny Montoya drove. At one point, a police officer, Peter Derrick, fired at the truck and hit it multiple times. Defendant Motyka, one of the pursuing officers, was shot in the shoulder by a bullet (fired by someone other than Mr. Valdez) while pursuing the pickup truck as it drove northbound on Osage Street. Defendant Motyka stopped his car, allowing Officer Jeremy Olive to take the lead. During the pursuit, the pickup became obviously disabled, with a smoking, derailed front tire, and was

listing to the side as it drove. Although dozens of police cars were in pursuit, the injured Defendant Motyka needlessly re-engaged in the pursuit.

The high-speed chase came to an end when the truck turned right onto 39th Street and crashed into a tree. The truck's crushed front end was wrapped around the tree, it was smoking, totaled and immobile. After the crash, Jude Montoya bolted from the passenger side of the truck, running into an alley. Officer Olive, the first officer on scene, voiced a lookout of Jude Montoya, and assessed the situation.

Mr. Valdez crawled from the wreck and immediately dove face down, to the ground, with his hands lifted to demonstrate that had no weapon and surrendered. Defendant Motyka, jumped from his car, and without any warning or command, intentionally shot Mr. Valdez in the back. Defendant Motyka continued shooting at Mr. Valdez, firing a total of at least 12 shots. Officer Macdonald joined in shooting at Mr. Valdez, simply because he saw Defendant Motyka firing at him, unloading at least seven shots.

Mr. Valdez had no weapon nor anything that could be confused for a weapon, posed no threat to the officers (or anyone else), and never reached or turned back toward the truck after exiting.

Mr. Valdez and others testified about his injuries, medical bills, and pain and suffering. Other witnesses testified about the failure by Defendant City and County of Denver to train its officers on the use of deadly force in stressful situations or where an officer was wounded.

## II.     THE COURSE OF LITIGATION

On, January 15, 2015, Plaintiff filed this 42 U.S.C. § 1983 lawsuit to vindicate his civil rights. [Dkt. 1]. During litigation, Defendants filed: two Partial Motions to Dismiss, [Dkts. 8 and 15], which the late Honorable Richard P. Matsch denied, [Dkts. 12, 22, and 26]. The denial was appealed by the Defendants to the United States Court of Appeals for the 10th Circuit which remanded the case back to the District Court for further proceedings after dismissing certain claims against the defendants.

The case proceeded with hard fought discovery as reflected by the many docket entries. [*See, e.g.*, Dkt. 62, Motion to Compel Responses for Requests for Production of Documents and to Compel Defendants to Answer Deposition Questions]. Defendants were insistent about taking the depositions of individuals in custody [Dkts. 49 and 50]. And requested unusual procedures for the depositions of the individual defendants. [Dkt. 51].

After certain discovery was completed and Plaintiff determined that individual Defendants Motz, Roller, and Derrick could be excluded from the

potential group of shooters who shot off Mr. Valdez's finger, a motion to dismiss these individuals was filed, as required by Fed.R.Civ.P. 11 [Dkt. 81]. Defendants resisted the motion to dismiss and instead filed two motions for Summary Judgment [Dkts. 82 and 83]. The Motion to Dismiss was granted, [Dkt. 100], and the Defendants' summary judgment motions were denied as moot. On April 17, 2019, Judge Matsch denied the remaining summary judgment motion as to the Defendants City and County of Denver and Motyka. The summary judgment motion as to Lt. MacDonald was granted. The Defendants then appealed the denial of the summary judgment to the United States Court of Appeals for the 10th Circuit. This appeal was determined to be frivolous and denied. [Dkts. 147 and 162].

Defendant City and County of Denver filed its third (or fourth) motion for summary judgment on May 15, 2020 which was denied. At the Defendants' suggestion, the parties mediated in July 2021. The mediation did not result in settlement.

The matter was scheduled for trial on July 13, 2020. The Defendants moved to continue the trial because of COVID-19 concerns and the social attitudes prevailing in the wake of the George Floyd homicide. This motion was granted by the Court resulting in the case, ultimately, being set for trial on September 13, 2021.

The case proceeded to a jury trial in this Court and a six-person jury unanimously determined that Defendants violated Mr. Valdez's Constitutional rights by shooting him in the back and improperly training police officers to recognize and manage stress and injury related actions after being shot.

### III. VERDICT AND DAMAGES

The jury's verdict was an affirmation of Mr. Valdez's case. The jury awarded Mr. Valdez damages in the total amount of $2,531,000 against the Defendants on both of Mr. Valdez's claims. [Dkt. 329]

### IV. OPINIONS

#### A. General Principles Related to a Determination of Reasonableness.

Courts in civil rights cases apply lodestar principles to determine the amount of attorney's fees to award a prevailing party. *See, e.g., Case by Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249 (10th Cir. 1998). The court determines the number of hours reasonably expended and a reasonable hourly rate, then multiplies the two together to establish the "lodestar." *Id.* The "resulting product is *presumed* to be the minimum reasonable fee to which counsel is entitled." *Pennsylvania v. Del. Valley Citizens Council*

Jeff Pagliuca
November 5, 2021
Page 4

for *Clean Air*, 478 U.S. 546, 564 (1986) (emphasis in original); *see also Blum v. Stenson*, 465 U.S. 886, 897 (1984).

B. **The Hours Expended Were Reasonable.**

It took approximately six-and one-half years to bring this case to trial. The Defendants contested virtually every fact and legal issue in the case, filing two motions to dismiss, three motions for summary judgment, motions to bifurcate the trial, multiple motions *in limine*, motions to strike, and three separate appeals, one of which was ruled frivolous.

The extensive motion practice required concomitant responses from the Plaintiff with the attendant fees and costs. More than 20 depositions occurred during the case, three outside of Denver, Colorado.

The discovery produced was voluminous. Defendants produced the equivalent of 11,609 paper pages of discovery and 160 audio/video files. The Plaintiff produced 2,486 pages. All of this material needed to be reviewed and organized. The investigative materials produced in connection with the officer involved shooting investigations and the prosecution of Chuck and Jude Montoya was voluminous, in the thousands of pages. This underlying investigation involved numerous expert issues such as ballistics, DNA, tool marks, and medical testimony. The protracted delays made witness location more difficult and time consuming than normal.

The trial was continued twice. The first continuance was at the request of the Defendants. The second was by the Court, *sua sponte.* These continuances necessarily caused additional work for the Plaintiff's lawyers.

The parties engaged in mediation at the Tenth Circuit Court of Appeals. The time the Plaintiff's attorneys spent preparing for and participating in that mediation was reasonable. At the Defendants' request, the parties engaged in private mediation prior to trial. The time spent preparing for and participating in that mediation was also reasonable.

The case was staffed very efficiently with the Plaintiff employing fewer lawyers than the Defendant. A review of the hours spent over the six-and one-half years reflects that generally one senior lawyer, primarily Ms. Menninger, supervised one associate, either Ms. Hubbard, Mr. Schindler, or Mr. Maxted. Mr. Pagliuca worked on discrete items up to trial and then prepared for and attended the trial. Typically, one paralegal worked on the matter under the direction of the associate or Ms. Menninger. Where appropriate, the lowest rate biller performed the task assigned.

The lawyers were very efficient in their trial preparation and able to present 21 witnesses and cross-examine 4 defense witnesses over eight days.



Jeff Pagliuca
November 5, 2021
Page 5

Plaintiff's counsel exercised reasonable judgment in their billing. As noted in their filings regarding attorney's fees, counsel for Plaintiff did not bill for substantial time incurred in intra-office conferences, internal emails, and consultations between more and less experienced practitioners in the office. Indeed, Plaintiff's attorneys are not seeking fees for the work of Norm Mueller and Ty Gee who collectively spent about ten hours consulting with other attorneys in the firm about various matters in the case.

The billing is sufficiently itemized to discern what tasks were performed and how long it took to perform each task. The time it took to perform the identified tasks was reasonable.

C.   **The Rate is Reasonable.**

The identified hourly rates are at or below Denver market rates for lawyer and support staff of comparable skill. Lawyers in the Denver area with comparable education, training, and experience bill at or more than the rates charged by Plaintiff's attorneys.

Mr. Pagliuca is a seasoned trial lawyer who has been, for many years, ranked or listed in Chambers & Partners, Best Lawyers, Super Lawyers, Top Lawyers, Avvo, and Martindale-Hubble. He has an excellent reputation as a superior trial lawyer. Mr. Pagliuca is a member of the American College of Trial Lawyers, an invitation only group limited to the top one percent of lawyers in a specified geographic area. Here, Denver. He has impressive legal research and writing skills, and his background both as a civil litigator and criminal defense lawyer made him uniquely suited for this case. Because he has familiarity with the practical and forensic aspects of the underlying investigation significant efficiencies were achieved. Mr. Pagliuca (and Ms. Menninger) have cross examined hundreds, if not thousands, of police officers and forensic scientists like Detective Gibbs, Mr. Reno, and Dr. Downs.

Mr. Pagliuca has also handled, and tried, numerous civil cases (including civil rights cases) and, accordingly, had the requisite pre-existing knowledge to represent Mr. Valdez in this case.

Ms. Menninger also has an impressive background as a civil and criminal defense trial lawyer. She, too, is listed in Best Lawyers, 5280 Top Lawyers and is a member of the American College of Trial Lawyers. Ms. Menninger has impressive legal research and writing skills and was a former judicial clerk in the U.S. District Court for the Southern District of New York.

The associate lawyers employed by Haddon Morgan and Foreman were, and are, top-notch with excellent pedigrees. Finally, the paralegals have many years of litigation experience and good academic backgrounds.

Jeff Pagliuca
November 5, 2021
Page 6

The law clerks employed by Haddon Morgan and Foreman were paid for their work. Other courts have found that $100/hour for law clerks is reasonable. *See C.D.M. v. Saul*, No. 19-1133-JTM, 2021 WL 1721053, at *1 (D. Kan. Apr. 30, 2021); *Moreno v. Colorado Basement Co., LLC*, No. 06-CV-01184-WYD-CBS, 2006 WL 8454654, at *9 (D. Colo. Dec. 7, 2006).

    **D.    The Costs Were Reasonable.**

This was a complex case involving numerous forensic issues, dozens of depositions, thousands of pages of discovery, and complicated civil rights issues related to municipal liability and *Monell* claims. The costs expended were minimal, reasonable, and necessary.

    **E.    Application of any Iteration of a "Reasonableness" Formula Supports the Fee and Cost Request.**

The hourly rates charged are normal and the time expanded was reasonable and necessary. Under a loadstar approach the fees, and costs, are therefore presumed, and are in fact, reasonable.

Rule 1.5(a) of the Colorado Rules of Professional Conduct instructs that all fees should be reasonable and provides eight factors to consider in evaluating the reasonableness of a fee:

    (1) <u>The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly</u>.

The time and labor required was substantial, as discussed above. The questions were novel, and difficult, as reflected by the numerous dispositive motions filed and litigated by the Defendants. This case required significant trial and writing skills that few lawyers possess.

    (2) <u>The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer</u>.

This case involved over 3,000 hours of work, and without a doubt, precluded the acceptance of other work, as noted in Mr. Pagliuca's affidavit.

    (3) <u>The fee customarily charged in the locality for similar legal services</u>.

The fees charged are normal and customary for the Denver market.

    (4) <u>The amount involved and the results obtained</u>.

Mary Jo Lowrey   Sarah J. Parady   Ben Lebsack   Sara Maeglin   1490 Lafayette Street, Suite 304, Denver, CO 80218
maryjo@lowrey-parady.com   sarah@lowrey-parady.com   ben@lowrey-parady.com   sm@lowrey-parady.com   p 303.593.2595 | f 303.502.9119 | lowrey-parady.com


The injuries and damages were significant. The result was excellent.

(5) <u>The time limitations imposed by the client or by the circumstances.</u>

There were no time limitations imposed by the client. However, the circumstances of this case were challenging given the many years it took the case to go to trial. It is reasonable to expect, as it happened on both sides of this matter, that employees will leave. Various employees, on both sides, left the case which necessitated replacement by others.

(6) <u>The nature and length of the professional relationship with the client</u>.

It appears that the nature of the relationship is excellent and long.

(7) <u>The experience, reputation, and ability of the lawyer or lawyers performing the services</u>.

Exceptional in all regards.

(8) <u>Whether the fee is fixed or contingent</u>.

This is a contingent fee. Accordingly, the lawyers were at risk of not receiving any recovery. The time invested was carried over many years.

All of these factors support the requested fees and costs.

## V.  CONCLUSION

The fees and costs requested are reasonable and should be awarded by the Court.

Sincerely,

Ben Lebsack

Encl.

**Exhibit A to Lebsack Expert Opinion re: Valdez v. Motyka, et. al.**

James Bennett ("Ben") Lebsack
Lowrey Parady Lebsack, LLC
1490 Lafayette Street, #304
Denver, CO 80224
303-593-2595
www.lowrey-parady.com
ben@lowrey-parady.com

## Professional Experience

Lowrey Parady Lebsack, LLC, Denver, CO
Partner, September 2018 – Present; Of Counsel, July 2016 – August 2018

· Practice primarily in the areas of employment law and legal ethics

Arckey & Associates, LLC, Centennial, CO
Associate, December 2012 – June 2016

· Practice primarily in the areas of employment law and personal injury

Chambers of Judge Daniel C. Moreno, 4th Judicial District of Minn., Minneapolis, MN
Clerk, April 2012 – October 2012

· Observed criminal and civil courtroom proceedings. Researched and drafted orders on variety of matters

## Admissions

Colorado Supreme Court, 2012

United States District Court for the District of Colorado, 2013

United States Court of Appeals for the Tenth Circuit, 2018

## Education

University of Minnesota Law School, J.D., 2012, *magna cum laude*

· Dean's List 2009 – 2012; Merit-based institutional scholarship 2009 – 2012.

· ABA Journal of Labor and Employment Law, Note and Article Editor 2011 – 2012, Staff Editor 2010 – 2011.

Grinnell College, Grinnell, IA, B.A. – Religious Studies, 2008

· Dean's List 2007 – 2008; Merit-based institutional scholarship 2004 – 2008

Ben Lebsack
Page 2

## Professional Honors, Memberships, and Activities

Designated a "Rising Star" in Super Lawyers 2017 – Present

Executive Board Member, National Employment Lawyers Association, 2019 – Present; Co-Chair of Ethics and Sanctions Committee 2019 – Present; Member, 2013 – Present

Chair of Board of Directors, Colorado Plaintiff Employment Lawyers Association, 2019 – Present; President, 2017 – 2019; Vice President 2016 – 2017; Member 2013 – Present

Board of Directors Member, Colorado Trial Lawyers Association, 2016 – Present; Chair of Employment Law Committee, 2016 – 2019; Co-Chair of Seminar Committee, 2020 – Present; Member 2013 – Present

Member, Colorado Bar Association Ethics Committee 2014 – Present

Member, Sam Cary Bar Association, 2018 – Present

Member, American Association for Justice, 2016 – Present

## Continuing Legal Education (As Presenter)

*The Strangers: Confidentiality and Privilege Issues with Third Parties on Client Communications & Invasion of the Privilege Snatchers: The Ethics of Maintaining and Exploring Privileges Held by Third Parties*, Colorado Trial Lawyers Association EthicsMania 2021 (October, 2021)

*Rules of Engagement: Addressing the Scope of Privilege in an Employment Context*, Colorado Bar Association 2021 Employment Law Conference (October, 2021)

*Attorneys Behaving Badly Part 2*, Colorado Plaintiff Employment Lawyers Association Annual Retreat (August, 2021)

*Ethics Bouillabaisse*, Colorado Trial Lawyers Association Civil Rights CLE Series (March, 2021)

*Ethics Corner*, Colorado Trial Lawyers Association Blockbuster (January, 2021)

*Confidentiality Clauses: Ethics*, National Employment Lawyers Association (November, 2020)

*Attorneys Behaving Badly, Deposition Edition*, Colorado Bar Association 2020 Employment Law Conference (October, 2020)

*Treating Your Staff Fairly and Legally*, Colorado Trial Lawyers Association Webinar (April, 2020)

*Ethical Considerations In Dividing Fees With Co-Counsel And Among Multiple Clients*, National Employment Lawyers Association (September, 2019)

*Confidentiality Clauses: Enforceability, Consequences, Cosby, and Ethics*, Colorado Plaintiff Employment Lawyers Association Annual Retreat (August, 2019)

*Ethics Opinion 130: Maintaining Client Confidences*, Colorado Trial Lawyers Association Annual Convention (August, 2019)

*Answers to Ethical Questions Commonly Posed by NELA Lawyers*, National Employment Lawyers Association Annual Convention (August, 2019)

*C.R.E.A.M. Considerations Relevant to Ethics About Money or CRPC Rules Everything Around ~~M~~Fees*, Colorado Trial Lawyers Association Annual Convention (August, 2018)

*The What For on But For*, Colorado Trial Lawyers Association Employment Law Seminar (June, 2018)

*Dishonesty, Fraud, Deceit, and Misrepresentation: Ethics of Investigating Claims and Using Private Investigators*, Colorado Plaintiff Employment Lawyers Association Ethics Seminar (May, 2018)

*Where is the Smoking Gun?*, Colorado Trial Lawyers Association Blockbuster (January, 2018)

*Intersection of Tort and Employment Law*, Colorado Trial Lawyers Association Employment Law Seminar (May, 2017)

*Drafting Specific Pleadings*, American Association for Justice Winter Convention (February, 2017)

*Protect Your Clients and Your Fees: Ethical Considerations in Preparing Initial Client Communications and Fee Agreements*, Colorado Trial Lawyers Association and Colorado Plaintiff Employment Lawyers Association Joint Plaintiff's Employment Law 101 Seminar (September, 2016)

*Warne v. Hall: To Be Fore-Warned Is to Be Fore-Armed*, Colorado Trial Lawyers Association Annual Convention (August, 2016)

*Warne v. Hall: Understanding Twombly and Iqbal, Lessons from Federal Courts*, Colorado Plaintiff Employment Lawyers Association Brown Bag (July, 2016)

*Ethical Issues in Employment Practice*, Colorado Plaintiff Employment Lawyers Association Brown Bag (April, 2016)

Ben Lebsack
Page 4

*A Funny Thing Happened on the Way to the Forum: It Moved and Your Client Agreed to Litigate There*, Colorado Plaintiff Employment Lawyers Association Brown Bag (June, 2015)

### Continuing Legal Education (As Organizer/Host)

Colorado Trial Lawyers Association EthicsMania 2021 (October, 2021)

National Employment Lawyers Association Annual Convention (June, 2021)

Colorado Trial Lawyers Association EthicsMania 2020 (December, 2020)

Colorado Plaintiff Employment Lawyers Association 2020 Retreat (August, 2020)

National Employment Lawyers Association Annual Convention (June, 2020)

Colorado Trial Lawyers Association Employment Law Seminar (June, 2018)

Colorado Plaintiff Employment Lawyers Association Ethics Seminar (May, 2018)

Colorado Plaintiff Employment Lawyers Association 2017 Retreat (August, 2017)

Colorado Plaintiff Employment Lawyers Association Representing Public Employees 101 (May, 2017)

Colorado Trial Lawyers Association Employment Law Seminar (May, 2017)

Colorado Trial Lawyers Association and Colorado Plaintiff Employment Lawyers Association Joint Plaintiff's Employment Law 101 Seminar (September, 2016)

Colorado Plaintiff Employment Lawyers Association 2016 Retreat (August, 2016)

### Articles

*Don't Indemnify for Third Party Claims to Money in Settlement Agreements, Follow the Ethics Rules Instead*, with Alessandra Morales, TRIAL TALK (July/September 2021)

*Shhhh, Be Quiet – Ethical Considerations in Agreeing to Confidentiality Terms in Settlement Agreements*, TRIAL TALK (June/July 2019)

*But I Earned Those Commissions, Didn't I?* TRIAL TALK (June/July 2016)

*A Funny Thing Happened on the Way to the Forum: It Moved and Your Client Agreed to Litigate There*, TRIAL TALK (June/July 2015)

*Confusion Demands Simplicity: Applying Rule 26 to ERISA Conflict of Interest Discovery Requests*, 27 ABA J. LAB. & EMP. LAW 121 (2011)

**Exhibit B to Lebsack Expert Opinion re: Valdez v. Motyka, et. al.**

Information Considered:

-Plaintiff's Motion for Attorney's Fees and Costs

-Affidavit of Jeff Pagliuca, including Exhibits 1-5 (Biography of Mr. Pagliuca, Valdez Detailed Fee Transactions, Laffey Matrix, USAO Attorney's Fees Matrix, and Willmeng Order).

-Bill of Costs Details and Receipts

-Valdez Expenses not in Bill of Costs

-16-1038 Docket Report

-19-1182 Docket Report

-19-1194 Docket Report

-15-00109 Docket Report

-Interview of Mr. Pagliuca October 28, 2021